JOHN PETTES and EPHRAIM INGRAHAM, JR., *v.* BANK OF WHITEHALL.

[IN CHANCERY.]

The court of chancery have no power to enjoin a judgment of the supreme court, where the ground for relief, set up in the orator's bill, is, that the supreme court, through haste, or inadvertence, rendered an erroneous decision.

When judgment, in the county court, is rendered in favor of the defendant, upon demurrer, without his having exercised, or waived, his right of review, in a case, in which if judgment were rendered against him, there could be no controversy as to the amount of damages, and the plaintiff excepts, and the judgment is reversed by the supreme court, the supreme court will proceed to assess the damages, and will not allow the defendant to review. *Semb.*

When a party has committed a *tortious* act, in consequence of a mistake of law, and the other party was not in fault, a court of equity will not relieve him from the consequences of his acts.

In this case, a sheriff, who held an execution, discovered a defect in it, which he supposed rendered it void, and he therefore neglected to execute it; and it was held that a court of equity could not relieve him from the consequences of his neglect of duty,—judgment having been rendered against him therefor in a court of law.

APPEAL from the court of chancery. The orators alleged, in their bill, that, from the first day of July, 1839, to the first day of December, of the same year, the orator Pettes was sheriff of the county of Windsor, and that the orator Ingraham was a deputy sheriff under him; that on the eighth day of July, 1839, Ingraham, who resided at Chester, received, in a letter from Daniel Roberts, Jr., of Manchester, an attorney at law, an execution in favor of the Bank of Whitehall against Edward Manning, Stephen Cummings and Addison Streeter of Ludlow, and Silas Briggs of said Manchester, for $555 damages, and costs, purporting to be issued upon a judgment rendered by Bennington county court, at their June Term, 1839, directed to the sheriff of the county of Windsor, or his deputy, to serve and return, made returnable within sixty days from date, and bearing date the thirteenth day of June, eighteen hundred

and nine ; that the letter inclosing the execution contained this suggestion,—" I am not acquainted with the circumstances of the ' debtors, but suppose them to be rather desperate ; of course, any ' reasonable security would be preferred by the creditors to a com- ' mitment ;" that Ingraham, not discovering but what the execution bore date in 1839, and supposing it to purport upon its face to be in full life, ascertained that the debtors were destitute of property, and that one of them had gone to the westward, and that the others had taken the poor debtor's oath on other matters, and that he so informed said Roberts, by letter, requesting directions how to proceed, as early as the 20th of July; that he waited until the 10th day of August, 1839, which would have been the last day but one of the life of the execution, if it had borne date in 1839, when, not having received any answer from Roberts, he arrested the debtors who were within his precinct, and took them to Woodstock, in order to commit them to jail; that, in making a copy of said execution for the jailer, it was discovered that the execution was dated in 1809 ; that Ingraham thereupon took advice from those upon whom he could depend, and was advised that he would be a trespasser, if he committed the debtors to jail upon that execution ; and that this was the first knowledge that Ingraham had, that said execution was not dated in 1839.

The orators farther alleged, that Ingraham thereupon discharged the debtors, and returned to Chester, and, on the 12th day of August, 1839, wrote a letter to Roberts, inclosing to him the execution, and informing him of the facts; that, if a correct execution had been returned to Ingraham within any reasonable time thereafter, the same debtors might have been again arrested, and the creditors have had the benefit of any security which they might have had, if they had been committed upon the first execution ; that the Bank of Whitehall commenced an action, which was entered at the November Term, 1839, of Windsor county court, against the orator Pettes, for the neglect of Ingraham to commit said debtors upon said execution ; that, at the May Term, 1840, of said court, judgment was rendered in favor of the defendant in that suit, upon demurrer to the plaintiff's declaration ; that the plaintiffs took exceptions, and the Supreme Court, at the February Term, 1841, reversed the judgment of the county court, and rendered judg-

Pettes et al. *v.* Bank of Whitehall.

ment in favor of the plaintiffs in that suit, for the whole amount of said execution, and interest;[*] that the counsel for Pettes, knowing that he had never reviewed the action, nor waived his right of review, applied to the court, as soon as the judgment was entered, for leave to enter a review, and have an issue formed to the jury, and have the same sent to the county court for trial, and were about to read the statute to the court, showing Pettes' right to a review of said action ; but that the court were in such haste to be on their way to the next county, to hold their session there, that they refused to hear the statute read, and forthwith decided that the action was not open to a review.

The orators farther alleged, that all of the said execution debtors were, at the time the execution was in the hands of Ingraham, wholly destitute of property, and had sworn out of jail, and that it would have been of no use to the creditors to have had them committed to jail.

And the orators prayed, that the defendants, might be perpetually enjoined from prosecuting or collecting the said judgment recovered against Pettes.

The defendants, in their answer, averred that they had never given any directions relative to the said execution, or the demand upon which it was predicated, except to have it proceeded with according to law; and that the mistake in the date of the execution was caused entirely by the error of the clerk who issued it, and was wholly unknown to them, or to their attorney, at the time when the execution was sent to Ingraham.   The defendants admitted the allegations of the bill as to the letters written, the commencement of their action against Pettes, and the recovery of the judgment by them therein, and that Cummings had sworn out of jail, as alleged in the bill, and that Streeter was poor; but they denied that he had sworn out of jail, or that either of the debtors was wholly destitute of property ; and they averred, that, by the neglect of Ingraham, they had lost the right to charge the bail of Manning, who was at the time out of the State.   They also admitted, that, if they had immediately sued out an *alias* execution, they might have arrested and committed Cummings and Streeter thereon, but denied that they

---

[*]Reported in 13 Vt. Rep. 395; *Bank of Whitehall* v. *Pettes.*

were bound to do so ; and they admitted the application to the Supreme Court for a review of their action against Pettes, as alleged, but denied that Pettes' counsel were about to read any statute " showing " his right to review, or that the court were in such haste to attend to other business, as not rightly to attend to the business then on hand, or that they erred in the decision which they gave.

The answer was traversed, and testimony taken on the part of the orators. From the testimony of Hon. Titus Hutchinson it appeared that Ingraham came to him, on the 10th day of Aug., 1839, and procured him to make a copy of the said execution, to be delivered to the jailer, upon the commitment of the debtors, whom Ingraham then had with him at Woodstock, and that, in making the copy, the error in the date of the execution was discovered by the witness, and that Ingraham asked his advice how to proceed, and that he told Ingraham that it was his decided opinion that the execution was dead, and that he would be liable to an action for false imprisonment, if he should commit the debtors thereon, and that nothing could be done upon that execution, which would be of any advantage to the creditors, and that he, Ingraham, thereupon concluded to discharge the debtors, and return the execution to the attorney from whom he received it. Testimony was also taken by the orators, tending to show that all of the debtors in the said execution were wholly destitute of any property, and that Cummings and Manning had, previous to the issuing of that execution, taken the poor debtor's oath.

The court of chancery dismissed the orators' bill, with costs ; from which decree the orators appealed.


*T. Hutchinson* for orators.

We contend that the attempt to collect this debt of the sheriff was an attempt at extortion, and that relief ought to be had in equity.

1. The debt was wholly valueless, by reason of the poverty of the debtors.

2. If the debt was of any value, it was as good, when the attorney of the bank received the execution, and was informed of its incorrectness, as when Ingraham received the execution. Even if

the creditors had a fair claim against the sheriff, they ought to have used all the means in their power to collect it of the real debtors.

3. The bank could have no claim at law, against the sheriff, for not serving this execution, unless upon the ground that the sheriff, in a case new to him, must bear the responsibility that three events should concur,—1, That the court should decide that they had power so to amend this execution, after a commitment upon it, as to give it retrospective life, and thus shield the sheriff for treating it as alive,—2, That the creditors should make application to the court for such amendment,—for the sheriff was no party to the record, and could make no motion concerning it,—and 3, That the court, in the exercise of their sound discretion, should in fact, on such application, allow such amendment. A curious responsibility, this, for a creditor to cast upon a sheriff.

4. If a court of law, deciding upon demurrer to the declaration of the bank against the sheriff, not bringing to view the various circumstances which create an equity in favor of the sheriff, can decide against him, we have a right to expect that this court, as a court of equity, will decide upon the equity now brought to view, and decree a perpetual injunction upon the judgment.

5. The orators have the strongest possible equity to be relieved from all the embarrassment the bank have subjected them to, by sending such a defective execution, and giving no notice of its defects. *King* v. *Baldwin,* 17 Johns. 384.

6. But it seems that the sheriff, after all his caution, made a mistake. He intended to obtain good advice, but in this he mistook. Let it be so. Is it not an important branch of chancery jurisdiction to relieve from burdens induced by mistake?

7. On page 160 of the Revised Statutes a review is given in all cases, with exceptions. This case is not among the exceptions; nor is it a case where a review is taken away on page 165. But the review is to be had before the county court, and the plaintiffs carried this case to the supreme court, before which no review can be had, though the orators had never waived their right of review. Therefore, either the orators were entitled to their review, or there is an unintentional slip in the statute; and *in either case* they should be relieved in equity.

8. If the orators have any equity in their case, the decision of

the court, rendering judgment on the demurrer to the declaration, does not withstand that equity. In *Blackhall v. Combs*, 2 P. Wms. 70, the defendant was sued for a debt, which accrued before his act of bankruptcy, and he was not able to procure his certificate, or a copy of it, to show his defence, and there was judgment against him ; and, on a bill for relief against that judgment, the chancellor decreed a perpetual injunction of the judgment. In *Gainsborough v. Gifford*, 2 P. Wms. 424, relief was granted after a verdict and judgment. In *Bell et al.* v. *Cunningham et al.*, 1 Sumner 89, 108, the circuit court granted a perpetual injunction upon its own former judgment, which had been affirmed by the supreme court of the United States, though there was no fraud, and neither party was to blame; and this because the judgment was unjust, as was made to appear by facts not proved on the trial at law. In *McDonald v. Nelson*, 2 Cow. 193, it is said " There is no doubt that the court of chancery has power to grant relief against deeds and judgments, not only when obtained by fraud, but also when regularly obtained, if there are circumstances of extraordinary hardship, or great inadequacy of consideration." And see *Ex'rs of Boyce* v. *Grundy*, 2 Pet. 210; *King* v. *Baldwin*, 17 Johns. 384; *Hepburn* v. *Dunlap*, 3 Pet. Cond. R. 540; *Bank* v. *Lewis et al.*, 8 Pick. 117; *Champlin* v. *Laytin*, 1 Edw. Ch. R. 467, 472, 473; 6 Paige 202; *Bingham* v. *Bingham*, 1 Ves. 127; *Willan* v. *Willan*, 16 Ves. 72; *Pusey* v. *Desbouvrie*, 3 P. Wms. 320; *Lansdown* v. *Lansdown*, Mosel. 364; *Naylor* v. *Winch*, 1 Cond. Ch. R. 561; 1 Story's Eq. 106, 120, 133, 134, 139, 149; *Lammot* v. *Bowley*, 1 Har. & J. 500, 525, 526; 2 Kent 491, *(n.) S. C.*; *Lawrence* v. *Banbier*, 2 Bayl. S. C. Rep. 626; *McCartly* v. *Decaix*, 1 Story's Eq. in note; *Lynde* v. *Wright*, 1 Aik. 383; 4 Johns. Ch. R. 619; 5 Ib. 494; Fonbl. Eq. 694, in note.

*E. Hutchinson* for defendant.

We have been unable to view the orator's claim in this case as any thing else, than, in substance, asking this court, sitting *quoad* a court of chancery, to *over-rule* the decision, which, upon mature deliberation, they have made in the same case at law. The case does not fall within the principles of any decided case, where a party has been restrained in equity from enforcing a judgment obtained

Pettes et al. *v.* Bank of Whitehall.

at law. No fraud is imputed to the defendants, nor any misrepresentation, or concealment of facts, nor any deception, practiced in any form, either upon the court, or the party, in the obtaining of that judgment. There is no pretence that the judgment is not in full force, or that it has been in any part satisfied ; nor that either the obtaining, or enforcing, of it, is to be regarded as a violation of any contract, or understanding, with the defendants, either express or implied; nor that the deputy's neglect, which was the foundation of that recovery, was at all induced by any act of the defendants, or their agent. For the bill expressly alleges that the execution would have been executed and returned within its life, had it not been for the discovery of the error in the date. But now the officer says, although it was in fact a good process, and I was in law bound to have executed it, (as established by that decision,) still, I at the time was told, and honestly believed, that the law was otherwise; and, inasmuch as the defendants in that process were all insolvent, and a levy would have done the creditors no good, a court of equity, ought to interpose, and prevent that judgment from being enforced against me. Now we ask, what reason is thus· far assigned for the interference of a court of equity, which is not presumed to have existed in ninety nine out of every hundred cases, where a recovery has ever been had in this state against an officer for a neglect to return an execution?

The officer's duty was, to have executed the process according to its commands. He says, that he omitted to do it, because he at the time was advised and believed that the law would not justify him in executing it. This court have decided (13 Vt. 395,) that that was a mistake. It was, then, (viewed in the light most favorable to the orators,) *a mistake of the law,* which occasioned the omission of duty, for which that recovery was had. But "mistake of the law 'is no excuse for an omission of duty ;—*Ignorantia legis neminem* ' *excusat ;*—and this maxim is equally as much respected in equity ' as in law." *See* Title " Mistake," 1 Story's Eq. Jur. 121, § 111; Ib. p. 124, § 112; Ib. p. 129, § 116; Ib. p. 153, § 137; Ib. p. 154, n. 1; Ib. p. 155, cases cited in n. 1; Ib. p. 156–7, § 138; Ib. p. 142, n. 1.

The insolvency of the debtors (if it were to be regarded as important for any purpose,) could only affect the damages. But the

question of damages is exclusively within the province of the court rendering the judgment. That question was raised in the suit at law, and the rule of damages was decided by that court to be the amount of the execution and interest;—and, in so doing, the court only *declared* the law, (although held differently in some of the sister States,) as it had been uniformly held by the courts of this state. *Hall et al. v. Brooks,* 8 Vt. 485. But it is said, that the fact of the insolvency of the debtors was not in proof before that court. True, but their judgment must necessarily have been based upon its assumed existence. Indeed, it is not pretended but that, had that fact been legally before the court, the decision *at law* must have been the same. But, though the established rule of damages, and long settled in all similar cases, and although decided to be the rule in this particular case *at law,* still it is contended, that that rule can be altered, in the same case, in chancery. That cannot be done. " The decision of a court of competent authority is conclusive upon " *all courts* of concurrent jurisdiction. *Hall et al* v. *Dana,* 2 Aik. 381. *Emerson* v. *Udall,* 13 Vt. 477.

Again, what would be the effect of sustaining the orators' bill ? If proof of ordinary diligence and good faith in the officer, coupled with the insolvency of the debtors, is to entitle the officer to relief in equity, upon the ground of one kind of accident, or mistake, he would be equally entitled to relief, whenever proof could be made of the same facts, and the accident, or mistake, arose from any other cause. No apparent hardship in any particular case can justify the confounding of all the distinctions of jurisdiction between different tribunals.

The bill sets forth the correspondence between the officer and the orators' attorney. We have already suggested, that the statements of the bill show, that the officer was in no measure induced to suffer the execution to expire in his hands by reason of any thing contained in those letters,—but it was occasioned solely and entirely by the supposed irregularity of the execution. But, even if it had been so, the letters were in the officer's possession and would have made a perfect defence at law. *Strong et al* v. *Bradley,* 14 Vt. 55. And the orators, having had the opportunity, if they wished, and having presented no plea raising any such question, (if there were any foundation for it in fact,) should be regarded as having understandingly

waived it, unless they could, after judgment against them at law, persuade the court, in its discretion, and as a mere matter of favor, to permit them to withdraw their demurrer and plead *de novo ;* which was not a matter of right, nor to be expected as a matter of discretion, and the refusal to grant which was neither *error,* nor a legitimate ground of application to chancery. *Emerson v. Udall,* 13 Vt. 477.

The allegations, that the orators were unjustly deprived of their right of review, that the Supreme Court " decided that said action ' was not open to review and refused a review 'in the same,"—also that the court would not listen to their application to send the case back to the county court for the purpose of having an *issue to the jury formed* and tried, but proceeded to render final judgment,—are open to the same objection. The bill states that they were points submitted and decided. They are, therefore, *res adjudicatæ ;* and, whether the decision was right or wrong, it is conclusive upon the court of chancery as well as all other courts. But who can doubt the propriety of that decision ?—Surely no review could have been granted *in* the Supreme Court. And, by force of our statute, whenever, as in this case, the pleadings present a mere naked question of law, and, after a final judgment in the county court, the case is passed on exceptions to the Supreme Court, that court, in one event, have only to affirm the decision below, and, in the other, to reverse the judgment below and "render such judgment thereon as ' ought to be rendered ;" Rev. St. p. 165,' § 40.

The bill farther sets forth, that " it is wholly inequitable that the ' said creditors, *sending to said Ingraham such a defective execution,* ' should now collect of said Pettes the amount of their said execu-' tion," &c. This comes the nearest to charging some blame in the matter upon the defendants, of any expression in the bill. If any such charge was intended, we have only to refer to the decision at law, (13 Vt. 395,) where the same matter was urged and the court decided that the process, (although it contained a clerical error committed by the clerk of the court issuing it,) yet was a good and valid process, and " that it was the officer's duty to have executed it." But, again, the decision at law was upon the ground, that the execution truly recited the judgment as having been rendered at the June Term, A. D. 1839 ;—and the court say that " No one could

'have inspected this execution without knowing what the date 'should have been." If it be urged that Ingraham's having had knowledge of the intended date does not help the matter, for the reason that, still, he was advised and believed that the precept would not justify him,—it then resolves itself again into simply a *mistake of the law*, which has been already sufficiently commented upon.

The opinion of the court was delivered by

REDFIELD, J. We do not deem it important to go much at length into the reasons of the decision in this case, in denying the relief sought. The court have sought industriously for some good ground for granting the relief asked, but find none.

The first ground, upon which the case is put by the counsel for the orator, is, that the court refused to grant a review in the case at law, when the orator Pettes was entitled to it; and that this was done in the hurry of closing up the term in order to go into the next county. I have no doubt we do a great many things, at such times, which need revision and correction,—but it is certainly a new doctrine, that such errors may be corrected in a court of equity. When a case is carried through to the court of last resort, and is not fairly and fully heard, and is consequently decided wrong, bring a bill in equity, and let the chancellor of the judicial circuit sit, as a court of error, upon the decisions of this court! The idea is too preposterous to be seriously entertained by any one, whose mind is not swayed by interest, or feeling. I have myself felt pressed by the severe hardship and obvious injustice of this case, and would willingly have sought out some remedy for the orators;—a majority, certain, if not all of the members of the court, who participated in the hearing, expressed the same opinion.

But, conceding all the facts, upon which the orator's counsel based their claim for relief, it seems too gross a departure from established rules, to reverse the decision at law by an application to a court of equity. The judgment at law is conclusive, unless there was some peculiar equity, which could not have availed at law, or unless the orators have been deprived of a fair and just hearing in the case by fraud, accident, or mistake; *Emerson* v. *Udall*, 13 Vt. 477, and cases there cited. Nothing of this kind is pretended, unless the accident, or mistake, of the court, in making a "*hurried*," or a

Pettes et al. *v.* Bank of Whitehall.

wrong decision, is included in the exception,—which will hardly be contended ;—for, if that were the case, no judgment of any court could ever be relied upon as final ; there might always be something objected to the character, or conduct, or decision of the court. This court, too, still remain of opinion, that the review was correctly denied,—which, indeed, we do not think important, as the denial itself *made the law of that case ; Fowler* v. *Pratt,* 11 Vt. 369.

The remaining ground, upon which the court have been urged to grant relief, seems to us to have been presented by the counsel in somewhat stronger light than it will bear. It seems to be supposed, by the counsel, to be the *ordinary case* of relieving from the consequences of a mistake of law. But, upon examination, it will appear that this is not such a case as courts of equity have ever granted relief in. Relief has sometimes, though not usually, been granted, when a party has suffered loss in a *contract,* in consequence of a mistake of the law. But I have never found any case, in which a party has committed a tort in consequence of a mistake, either of law, or fact, and the other party was not in fault, that a court of equity has interfered to relieve the party from the legal consequences of his tortious act. And if this could, by any possibility, be done, it seems it should be done before a final judgment at law. But the truth is, no court of equity would sit to relieve a man from the consequences of his acts, or *omissions,* of a tortious nature, any more that it would, to relieve against the disappointments consequent upon the change of the seasons, the winds, or the tides.

It is truly unfortunate that the orator Ingraham did not commit the debtors in the defendant's execution ; for the worst, that could have resulted to him, would have been an action for false imprisonment, with nominal damages and nominal costs. But the other alternative, if the execution did turn out to be legal, exposed him to the certainty of paying the entire debt, unless the [court should grant relief, by distinguishing it from the ordinary case of one wholly neglecting to serve an execution,—which, it seems, they did not, but gave judgment for the whole sum. And in a doubtful case, when the consequences of mistake might be so fearful, it would certainly be most prudent to take the safe side of the dilemma. But Ingraham, upon advice which he deemed safe, chose to risk all,—and lost all.

Pettes et al. *v.* Bank of Whitehall.

It does not seem to the court that there was any blame on the part of the defendants, in putting a defective execution into Ingraham's hands. The defect was merely a clerical one, one not the most wonderful of occurrence, and one which was doubtless unknown to all, until discovered by Ingraham too late to correct it. Under such a state of facts, it would hardly do to charge blame upon the defendants, as having virtually decoyed Ingraham into this error;—and if there were any proof of such conduct on their part, or that of their agents, or attorneys, it would have afforded a perfect defence at law;—but, in truth, there is no satisfactory evidence of even neglect on the part of any one, but the clerk, in regard to this defect. There does not, then, seem to be any ground of redress in this proceeding.

After spending considerable time in reflecting upon this case, it seems to me, that, if there was any point, at which redress could have been afforded Ingraham, it was in giving him a hearing in damages in the action at law; which would have been just and reasonable; and, if that question were now before me, I confess I should be inclined to hesitate, before rendering judgment for the full amount of the execution. That question does not appear to have been brought to the consideration of the court in particular, and probably was not much considered. It came so near to the cases of voluntary neglect of an officer to levy an execution, which had been already settled by this court, that it was not thought practicable to distinguish them. But, upon farther reflection, it seems to me that the cases are distinguishable upon sound grounds, and that the fact that Ingraham did proceed to arrest the bodies of the debtors, and carry them to prison, and then only failed to commit them from a defect in the execution, although merely clerical, should have entitled him to reduce the damages to the loss actually sustained by the defendants.

But this ground of relief is not alleged in the bill, and does not seem, by the report of the case, to have been presented to the court, and may not be sound ; but if it is not, then there does not seem to me to have been any remedy, ever in the power of the orators. And if that had been a good defence at law, it would be no ground of relief here; and there is no mode of opening the case at law;—so that the case, although a hard one, does seem to be remediless.

Decree of the chancellor affirmed, with costs.