H. H. POWERS AND H. S. PECK, EXECUTORS OF ALDEN E. JUDE-
VINE'S ESTATE, AND H. H. POWERS, AND S. BLANCHE KENT
*v.* THE TRUSTEES OF CALEDONIA COUNTY GRAMMAR SCHOOL.

May Term, 1915.

Present:    MUNSON, C. J.; WATSON, and HASELTON, JJ., and STANTON
and FISH, SUPR., JJ.

Opinion filed April 19, 1919.

*Prior    Judgment—Conclusiveness—Schools—School    Lands—
Trust    Estate—Limitation    as    to    Conveyance—Binding    in
Equity—Dealing Inconsistent With Trust—Attempted Sale
—Party Left to Remedy at Law—Questions not Briefed
Waived—Conclusiveness of Prior Judgment in Equity—
Reformation of Instrument—Mistake of Law not Equitable
Ground for Relief—"Fee Simple"—"Lease"—Decree of
Less Estate Than Granted—Perpetual Lease—Reservation
of Rent—Right of Re-entry—Estoppel of Grantees—Mala
Fide    Purchasers—Purchaser's    Executors—Constructive
Knowledge—Estoppel Where Both Parties Have Equal
Knowledge—Mesne Profits—Judicial Notice—Accounting—
When Refused—License—Revoked By Death of Licensee—
Possession of Licensee's Executors—Accounting for Wrong-*

*ful Use of Land Held in Trust—Waste—Stumpage Value—Liability of Grantee of Executors.*

The adjudication of facts in a suit is conclusive of the same facts or questions in a subsequent suit between the same parties.

In a prior ejectment suit between the same parties it was established that the lot of land in question was a grammar school lot held by the defendant therein under and by virtue of a so-called perpetual lease from the trustees of the grammar school for which defendant's grantors had paid $100 in lieu of all future rent, and it was held that said lease was in law an attempted conveyance in fee, and, as such, was void; that the grant of said land to said trustees contemplated that it be so leased as to result in a yearly income for the school's use and support; that it was intended by the Legislature, and so within the statute, that there be a reservation of rent payable annually; and that at no time did the school, through its trustees, have a right to anticipate the future rents, or sell the land and receive the pay therefor, to the injury of future generations. equally entitled to the benefit of the use. In a suit for the reformation of said so-called perpetual lease and for its specific enforcement as reformed, *held,*

(1) That the provisions as to the management and disposition of said land are none the less obligatory in a court of equity than in a court of law;

(2). That the grammar school holds the land subject directly to a trust in the form of a power, and equity will not allow it to deal with the estate in a manner inconsistent with the trust and to the prejudice of the *cestuis que trust;*

(3) That, since the attempted conveyance in fee was an act in destruction of, and a fraud on, the power, a court of equity will not give sanction thereto, but will leave the plaintiffs to their remedy at law unless a case is presented with such equities as in justice entitles them to relief, having regard to the proper execution of the power, to the end that the land be held and leased so as to yield an income annually to both the present, and in turn the future, objects of the power.

Questions not briefed are waived.

The judgment in the ejectment suit is conclusive as a whole, within its scope, unless there was some peculiar equity which could not have availed at law.

From the fact that the so-called lease, as was held in the ejectment

suit, gives no estate at law, it does not necessarily follow that it does not raise a right to have an estate in a modified form created in equity.

The execution and delivery of the so-called perpetual lease was conclusively established by the finding in the ejectment suit that the defendant therein holds possession of the lot in question, "under and by virtue of a perpetual lease from plaintiffs to her grantors."

Since the mistake of the parties at the time the so-called perpetual lease was executed was not in respect of the instrument executed, but was a mistake of law solely as to the power of the grammar school to make such a contract in relation to such public land held by it, equitable relief by way of reforming the contract cannot be granted.

A grant in fee simple is an estate of perpetuity and confers an unlimited power of alienation, while a lease grants an interest less than the grantor's and reserves to him a reversion.

The doctrine that, where the landlord, from the limited extent of his estate or power, is unable to give in point of duration a lease for the whole interest agreed upon, if the boundaries between the excess and that which he may give are clearly distinguishable, the lessee may be decreed a lease to the full extent of the lessor's granting power, is not applicable to this case.

Considering the purpose of the grant of the land in question to the grammar school, a reservation of rent payable annually and the right to re-entry in case of nonpayment of rent are material and substantive requirements to be contained in a lease of the same.

Inferences undertaken to be drawn from the facts found and reported by the master, which are inconsistent therewith, are of no force on review.

The right to re-enter for nonpayment of rent is not incident to the estate of the lessor at common law, but must be reserved by deed.

Equity may compel parties to perform their agreements, when fairly entered into, according to their terms; but it has no power to make agreements for parties and then compel them to execute the same.

The fact that the defendant stood by for sixty years and saw H. and J. (the original grantees) and their successors take possession of the land in question, treat it as their own, cut lumber upon it, and ultimately sell and convey it, all in good faith, and with the understanding, induced by defendant's conduct, that they had a lawful right so to do, does not in equity estop it from asserting that plaintiffs' acts were unlawful, because, at the time they entered

into the contract in question, H. and J. knew of the public character of the land, and were affected with knowledge of the purpose of the grant by the defendant, and its limitations in connection therewith.

The taking of the legal estate in fee by H. and J., after knowledge that the objects of the power had a prior and continuing right to the annual use of the land in question, and that the donee of the power could convey the land only in a manner consistent with its powers and productive of such use, made them *mala fide* purchasers, even though they may have been purchasers for a valuable consideration in every other respect.

The executors of J. stand in his place, and what was known to him was constructively known to them as his legal representatives.

Where the facts are known to both parties, or where both parties have the same means of ascertaining the truth, there is no estoppel.

In an accounting between the plaintiffs and the defendant as to the money paid by H. and J. as commuted rent, on the one hand, and a reasonable rent for the land as of the same period, on the other hand, the period prior to J.'s death cannot be combined with the period subsequent thereto, because the accounting for the earlier period rests upon the acts of H. and J., and J., lawfully in possession of the land, while that of the latter period rests upon acts performed after J.'s death by his executors and others, standing as wrongdoers and having no rights upon the land whatever.

The general rule in an action for mesne profits is that the plaintiff may recover the annual value of the land from the time of the accruing of his title; and sometimes the amount of mesne profits may be ascertained by proving the profits actually received.

Under G. L. 2122, the plaintiff in an action of ejectment may recover not only the profits that might have been made from the use of the premises recovered, but also such consequential damages as have resulted from the acts of the defendant while in the wrongful occupation of the premises.

In considering an accounting for the use of lands from 1852 to 1888, the time of J.'s death, the court will take judicial notice of the general economic and commercial history of that period.

Because of the considerable lapse of time, the few material facts relevant thereto, and the difficulty of doing entire justice, from a consideration of public policy an accounting for the period prior to J.'s death is refused, other than to let the account on one side offset and balance the account on the other.

The license created by the so-called perpetual lease to enter upon the land attempted to be conveyed by it, being personal, and in law revoked by the death of J., the land held by him under it was not descendible, and at his death formed no part of his estate.

The possession and occupancy of the land in question by J.'s executors after his death was that of wrongdoers, and equity requires them to account for the actual stumpage value of the timber cut, with simple interest from the time of cutting, notwithstanding they received for the timber in selling it on the stump, less than its actual value.

Rightful possession of the wrongdoer is essential to the character of waste, and constitutes a material distinction between waste and trespass.

Since J.'s executors had no right in or on the land in question, nor in or to the timber standing thereon, they conveyed none to their grantee, under whose contract the timber was cut, and his estate is chargeable with the same measure of damages as are his vendors.

It was established in the ejectment suit that the defendant therein was in the unlawful possession of the land in question, but, since there is no finding that she did or caused anything to be done on the land by way of cutting timber or otherwise resulting in damage to the land or the owner, the plaintiff in that suit, in addition to judgment to recover the seisin and possession of the demanded premises with costs, is entitled to nominal damages only.

APPEAL IN CHANCERY. Bill to reform a so-called perpetual lease, and for the specific enforcement of said lease as reformed. Heard on the bill, answer, cross bill and answer, replications, and special master's report at the June Term, 1914, Caledonia County, *Butler*, Chancellor. Decree for the plaintiffs. The defendants appealed. The opinion states the case.

*Elisha May* and *Porter, Witters & Harvey* for the defendants.

*Dunnett & Leslie* and *W. A. Dutton* for the plaintiffs.

The court of chancery had authority to decree that the defendant execute to the plaintiffs such a conveyance as it, by the terms of its charter, had power to make in the year 1848. *Lamp-*

*son et al.* v. *New Haven,* 2 Vt. 14; *Mining & Quarrying Co. et al.* v. *Windham Co. Bank et al.,* 44 Vt. 489; *Fowler* v. *Sands,* 73 Vt. 236; *Wallace* v. *Scoggins,* 18 Ore. 502, 17 Am. St. Rep. 749 and note pages 752, 755; *Eaton* v. *Whittaker,* 18 Conn. 222, 44 Am. Dec. 486; *Smith* v. *St. Phillip's Church* (N. Y.), 14 N. E. 825; *Drake* v. *Board of Education,* 208 Mo. 540, 106 S. W. 650, 123 Am. St. Rep. 448 and cases cited in note page 467; *Squire* v. *Learned* (Mass.), 81 N. E. 880; *Seman* v. *Aschermann,* 51 Wis. 678, 37 Am. Rep. 849; *B. & O. S. W. Ry. Co.* v. *Brubaker,* 217 Ill. 462, 75 N. E. 523, 526; *Pomeroy's Equity Jurisprudence* (3d Ed.) Vol. 4, Sec. 1402, and cases cited in note 1; Story's Equity Jurisprudence, Sec. 716.

If a deed cannot operate in the precise way intended, yet if it can operate in another mode, it will be so construed. *Goodtitle* v. *Bailey,* Cowper 597; *Staffordville Gravel Co.* v. *Newell,* 53 N. J. L. 412; *Sheppard's Touchstone,* 82; *Lynch* v. *Livingstone,* 8 Barb. 463; *Jackson* v. *Bloggett,* 16 Johns. 172; *Bryan & Wife* v. *Bradley,* 16 Conn. 473; *Russell* v. *Coffin,* 8 Pick. 142.

WATSON, J.   The plaintiffs have brought their bill in this case for the reformation of the so-called perpetual lease involved in the case of *The Trustees of Caledonia County Grammar School* v. *S. Blanche Kent,* an action of ejectment, in which a decision was rendered by this Court as reported in 86 Vt. 151, 84 Atl. 26, and for the specific enforcement of said lease as reformed. The plaintiff in the ejectment suit is the defendant in this suit, and is hereinafter generally referred to as the "Grammar School." In the ejectment case, judgment was reversed, and judgment rendered for the plaintiff therein to recover the seisin and possession of the demanded premises with costs, and the cause remanded for assessment of damages.   The demanded premises there in question constitute Lot No. 10, Range 18, Division 3, of lands in the town of Hardwick.

The facts were established in that case that said Lot No. 10 was located by the town of Hardwick as a Grammar School Lot, as provided by the town charter; and that the defendant therein holds possession of the lot under and by virtue of a perpetual lease from the Grammar School to defendant's grantors, Holton and Judevine, as early as 1847, one hundred dollars being paid by the latter therefor in lieu of successive payments of rent at

the end of regular stated periods during all future time.   Thus the foregoing facts stand as adjudicated, and they are conclusive of the same facts or questions in this case.    *Lamoille County Bank* v. *Hunt*, 72 Vt. 357, 47 Atl. 1078; *Sowles* v. *Sartwell*, 76 Vt. 70, 56 Atl. 282; *Blondin* v. *Brooks*, 83 Vt. 472, 76 Atl. 184.

It was there held that the lot in question having been located by the town in which it is situated as a grammar school lot under the provisions of the town charter, the said trustees were authorized and empowered ''to hold and lease'' the land for the use and benefit of the County Grammar School: but that this was the extent of their power; that they were not authorized or empowered to convey the fee, nor the whole interest and estate of the County Grammar School therein; that by the express terms of the grant said trustees were to *hold* the lands, as well as to lease them; that the so-called perpetual lease from said trustees to Holton and Judevine, instead of being a lease, was in law an attempted conveyance in fee, and as a conveyance of such public lands it was void.   It was further there held that the grant of the lands to the said trustees contemplated that they be so leased as to result in a yearly income therefrom for use in the support of the County Grammar School; that it was intended by the Legislature, and so within the statute, that there be a reservation of rent payable annually; and that at no time did the County Grammar School, through its trustees, have a right to anticipate the future 'rents, or, in contemplation as we have seen, sell the lands and receive the pay therefor, to the injury of future generations equally entitled to the benefit of the use.   These provisions are none the less obligatory in a court of equity than in a court of law.   In *Hedges* v. *Dixon County*, 150 U. S. 182, 37 L. ed. 1044, 14 Sup. Ct. 71, the Court, speaking through Mr. Justice Jackson, said: ''Where a contract is void at law for want of power to make it, a court of equity has no jurisdiction to enforce such contract, or in the absence of fraud, accident, or mistake to so modify it as to make it legal and then enforce it.   Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law.   They are bound by positive provisions of a statute equally with courts of law, and where the transaction, or the contract, is declared void because not in compliance with express statutory or constitutional provision, a court of equity cannot interpose

to give validity to such transaction or contract, or any part thereof." See *Ellingwood* v. *Ellingwood,* 91 Vt. 134, 99 Atl. 781.

The Grammar School holds the land subject directly to a trust in the form of a power, and equity will not allow the corporation to deal with the estate in a manner inconsistent with the trust. See article by Professor John C. Gray, 25 Harv. L. Rev. at pages 1, 2; *Attorney General* v. *Aspinall,* 2 Mylne & C. 613. "The court of chancery," says Mr. Spence, "will exercise its powers to prevent the conduct of the trustee, whether actively or passively, from prejudicing the *cestuis que trust,* however reasonable their motive may have been." 2 Spence, Eq. 41.

Since the power of the Grammar School, as to conveying the property, is limited in the manner and purpose as stated above, the attempted conveyance in fee, established in the action of ejectment, was an act in destruction of, and a fraud on, the power, and instead of a court of equity giving sanction thereto, it will leave the plaintiffs to their remedy at law, (*Harnett* v. *Yielding,* 2 Sch. & Lef. 549; *Aleyn* v. *Belchier,* 1 Eden, 132, 1 Wh. & Tud. Lead. Cas. [4th Am. ed.] 573,) unless a case is presented with such equities as in justice entitles them to relief, having regard to the proper execution of the power, to the end that the land be held and leased as contemplated by the grant creating the power, so as to yield an income annually to both the present and in turn the future objects of the power. In *Wheate* v. *Hall,* 17 Ves. Jun. 80, Sir William Grant, M. R., says he "cannot conceive that a court of equity will sanction the application of a power to purposes, clearly and obviously foreign to those, for which it could have been originally intended." In *Aleyn* v. *Belchier,* it is said: "No point is better established than that *a person having a power must execute it bona fide for the end designed, otherwise it is corrupt and void.*" To lose sight of the purpose of the trust, or to grant relief in disregard of the contemplated yearly use of the land to which the power is annexed, is to be oblivious of the solicitude of the founders of the State, respecting the education of its youth, as shown by the provisions placed in the organic law concerning the same, including the incorporation and support of grammar schools in the several counties.

The ejectment case being remanded to the county court for the assessment of damages, the bill in the present case was filed

by the executors of Judevine's estate, and H. H. Powers, and S. Blanche Kent, seeking to compel the Grammar School to execute such a conveyance as it had a right to make as of the date when the attempted conveyance was made, so that, as far as legally may be, the contract entered into more than half a century ago and alleged to have been acted upon in good faith during such long period of time, may be effectuated; also praying for other and for general relief.

The bill alleges and the record shows that in 1910 two suits were brought by the defendant, one the action of ejectment mentioned above, and the other an action of trespass *quare clausum fregit* against the plaintiff Powers and George T. Howard for cutting timber standing on the lot in question. The prayer asks that the defendant be perpetually enjoined from further prosecuting either of those suits. By a temporary injunction still in force, their further prosecution was enjoined until further order of the court.

The Grammar School made answer, and demurred to the bill. The demurrer was overruled and the questions raised thereby were reserved to the final hearing. The case was heard before a special master, upon whose report and exception thereto the decree below was rendered in favor of the plaintiffs, and defendant appealed. The records in the two actions at law are referred to by the master and made a part of his report. Pending the hearing before the master, the defendant, by leave of the chancellor, filed its cross bill, praying for an accounting for timber cut on the lot, and for general relief.

The questions raised by the demurrer are waived, not having been briefed.

The lot in question is called in the master's report "10-18," and is found to contain 70 acres of land. Holton and Judevine went into the possession of the land at the time of receiving the attempted conveyance in controversy, thence continuing until 1867, when Holton sold his interest to Judevine who continued in possession down to his death in February, 1888. The master finds that the executors of Judevine's estate continued in possession until 1894 or 1895, when they sold the stumpage thereon to George T. Howard, and in 1905 they sold the fee to Howard. Later the latter, by warranty deed, conveyed an undivided third part of the same to the plaintiff Kent. Howard died in the winter of 1911-1912. At the hearing before the master, and be-

fore any testimony was taken, Hon. Alexander Dunnett, one of the plaintiffs' solicitors, stated that his firm represented also Howard's estate, and if the master should receive evidence respecting the timber cut on the lot in question and the value of it, that estate desired to become a party to the suit, and gave notice of a request so to enter. At the same stage of the proceedings, defendant's solicitor presented a paper writing, insisting that the Howard estate, Ira Rich Kent, and Ella Howard, were necessary parties, and giving notice that defendant would ever insist upon want of necessary and proper parties.

After the filing of the master's report and exceptions thereto, but before the filing of the decretal order, George H. Howard, executor of George T. Howard's estate, presented his petition to the chancellor asking for, and was granted, leave to enter as party plaintiff, and so entered. The said petition alleges, among other things, that after the said action of trespass was brought, the said George T. Howard died; that a claim was presented before the commissioners upon his estate, by the Grammar School, for a large amount of damages; that said claim was disallowed by the commissioners, and an appeal was taken from such disallowance, which appeal is still pending in the county court; and asking leave, as such executor, to become a party plaintiff in this action, and praying for an order making him such party, to the end that the rights, duties, and liabilities of said estate and its executor, as regards the matters and litigation in said action, may be determined herein.

The death of plaintiff H. H. Powers being suggested of record, the executors of his estate were granted leave to enter as parties plaintiff, and so entered. Also Ella S. Howard, claiming some right in the lot in question, on leave granted, entered her appearance as party plaintiff. Subsequent to these persons thus becoming parties to the suit, the decree below was rendered and the cause passed to this Court.

It is urged by the Grammar School that the judgment of this Court in the ejectment case is final and conclusive as to every question. But this is hardly an accurate statement of the rule. As already seen, the judgment in that case is conclusive as to certain questions of fact, also as to certain questions of law; and it is conclusive as a whole, within its scope, unless there was some peculiar equity which could not have availed at law. *Emerson* v. *Udall*, 13 Vt. 477, 37 Am. Dec. 604; *Pettes* v. *Bank*

*of Whitehall,* 17 Vt. 435; *Churchill* v. *Capen,* 84 Vt. 104, 78 Atl. 734. A court of law acts upon a contract according to its terms as shown by the instrument executed by the parties. Relief by way of reforming a contract and its specific enforcement as reformed, can be had only in a court of equity. From the fact that the so-called lease, as was held in the action of ejectment, gives no estate at law, it does not necessarily follow that it does not raise a right to have an estate in a modified form created in equity. *Wykham* v. *Wykham,* 18 Ves. Jun. 395; *Parker* v. *Taswell,* 2 DeGex. & J. 559, 8 Eng. Rul. Cas. 642.

It is also urged by the Grammar School that there is no finding that a lease was in fact ever committed to writing and executed by the parties, or, if one was made, that it was lost. Adverting to the facts established in the ejectment suit as stated above, we think the finding that the defendant therein holds possession of the lot in question "under and by virtue of a perpetual lease from plaintiffs to her grantors," necessarily involved the question whether such a lease had been given; for in order to hold possession under and by virtue of such a lease, one must have been executed by the Grammar School to, and received by, Holton and Judevine. This fact being thus conclusively established by the record of the ejectment suit, whether other evidence received by the master was admissible on that question is of no importance.

Regarding the giving of that instrument, the master reports that it appeared in evidence that in 1848 the Grammar School attempted to lease the lot in question to Holton and Judevine "by the method indicated in the records of the case of the *Trustees, etc.* v. *Kent,* 86 Vt. 151," 84 Atl. 26, which is the ejectment case mentioned above; that Holton and Judevine paid one hundred dollars as rent for all time, and that this payment was completed on February 20, 1852; that perpetual leases with commuted rent were made by the said trustees in other cases, both grantors and grantees believing they had a right so to contract, and that such was the case with respect to the lease of the lot in question to Holton and Judevine.

It should seem from the foregoing findings that the parties, at the time of entering into the contract in question, with full knowledge that the lot was Grammar School land—public in character—and that the Grammar School held it as such, and without any fraud or surprise being practiced by either upon the

other, (leaving until later the question of fraud upon the power, and fraud upon future generations entitled to the use of the land,) and without any mistake other than that both parties believed the Grammar School had a right so to contract, made the agreement as they intended it should be, and the instrument of conveyance executed by them expressed the transaction as it was understood and designed to be.  So, at most, as between the contracting parties, and without noticing in this connection the element of fraud of the nature mentioned above, there was a mistake of law solely as to the power of the Grammar School to make such a contract in relation to such public lands held by it. This mistake was not in respect of the instrument executed. That was in conformity with the verbal contract, and as both parties intended it should be.  Upon these facts, equitable relief by way of reforming the contract cannot properly be granted. We have recently held that reformation leaves untouched the verbal contract that the written instrument is intended to evidence, and deals only with the writing itself; that the mistake must intervene between the two; that the party seeking reformation must establish a mistake in respect of the writing only; and that such mistake and also a standard to which the writing can be reformed, must be established by evidence so strong and conclusive as to place them beyond reasonable doubt.  *Fairbanks* v. *Harvey*, 83 Vt. 283, 75 Atl. 268; *Fife* v. *Cate*, 84 Vt. 45, 77 Atl. 947.

The standard established by the report of the master is the same as the contract shown by the record of the ejectment case. The Grammar School "attempted to lease 10-18 to said Holton and Judevine by the method indicated in the records of" that case, says the master, which was by way of a perpetual lease with commuted rent paid in gross sum for all future time, and in effect the finding is, that this is the way it was done.  Indeed, in answer to defendant's fifteenth request, the report states, "the master finds that the sum of one hundred dollars was paid the Grammar School by Holton and Judevine as commuted rent on a perpetual lease of 10-18."  This does not show a standard to which the written instrument can be reformed, even though it were established, as the chancellor undertook to infer from the facts reported by the master, that the intent of the parties was "to effect a lease rather than a sale."

The decree states that the Trustees of Caledonia County

Grammar School had a right to make a perpetual lease, and this they undertook to do, and that this lease was not in duration outside of their authority, but was held void at law because the rent was commuted. This statement is not in accord with our holdings in the action of ejectment; nor is it in accord with the case made by the plaintiffs' bill, wherein it is alleged that the lease was held invalid by this Court, "for that it ran perpetually and was given for a commuted rent." From what we have already said, it is seen that this allegation in the bill is (in a few words) a correct statement of the grounds upon which the holding of invalidity in that case was based. In the opinion there given we pointed out the difference between a grant in fee simple and one by lease. The former "is an estate of perpetuity, and confers an unlimited power of alienation," while "by a lease one grants an interest less than his own, reserving to himself a reversion."

"A reversion," says Coke upon Littleton, 22, b, "is where the residue of the estate always doth continue in him that made the particular estate, or where the particular estate is derived out of his estate, * * * so it is of a lease for life, or for years." "It necessarily assumes," says Chancellor Kent, "that the original owner has not parted with his whole estate or interest in the land; * * * If A. has only a possibility of reverter, as in the case of a qualified or conditional fee at common law, he has no reversion." 4 Kent's Com. (11th ed.) 389. But where, as in the instance here involved, the conveyance is one in perpetuity of the whole estate, with a gross sum then paid as the full consideration for the conveyance, and there is no reservation of rent payable at stated intervals or otherwise, in the future, and the instrument of conveyance contains no clause of forfeiture, or giving the right of re-entry, for noncompliance with any of its provisions, upon what principle of law can it be rightly said that there is a reversion, or the possibility of reversion, in the grantor, or any estate or interest in the land reserved to the grantor? See *DePeyster* v. *Michael,* 6 N. Y. 506, 57 Am. Dec. 470; *Nichol* v. *New York & E. R. Co.,* 12 N. Y. 121; *Van Rensselaer* v. *Hays,* 19 N. Y. 68, 75 Am. Dec. 278; *Van Rensselaer* v. *Read,* 26 N. Y. 558; *Hudson Tunnel Co.* v. *Attorney General,* 27 N. J. Eq. 573; *Conn. Spir. Camp-Meeting Ass'n* v. *East Lyme,* 54 Conn. 152, 5 Atl. 849; *Penick* v. *Atkinson,* 139 Ga. 649, 77 S. E. 1055, 46 L. R. A. (N. S.) 284, Ann. Cas. 1914 B, 842; 16 R. C. L. 618.

Sometimes where specific performance of a lease is sought, if it turns out that the landlord, from the limited extent of his estate or power, is unable to give in point of duration a lease for the whole interest which he agreed to give, if the boundaries between the excess and that which is conformable to the power are clearly distinguishable, and the latter part be distinct from, and independent of, the former, and the intended lessee is willing to take the interest which the landlord can give, (the case being otherwise made out,) the latter will be decreed to grant a lease to the full extent which his estate or power authorizes, with or without compensation (as the equities shall appear) to the lessee for the loss he may have sustained by reason of the agreement not being carried out to the full extent. The cases of *Alexander* v. *Alexander*, 2 Ves. Sr. 640, 21 Eng. Rul. Cas. 415, and *Leslie* v. *Crommelin*, 2 Ir. Rep. Eq. 134, are instructive on this doctrine; and the limitation to its application is shown by Professor Pomeroy in his Treatise on Specific Performance of Contracts, (2nd ed.) sec. 442. But this doctrine cannot be applied here for at least two reasons: (a) The case is not otherwise made out; (b) the inequitable incidents connected with the agreement made were such as not to justify this form of relief.

As before stated from the holdings in the ejectment case, the grant of these lands contemplated that they be so leased as to result in a yearly income therefrom for use in the support of the County Grammar School, and that such income could be realized only by a reservation of rent payable annually, and that this was intended and required by the Legislature. From this it necessarily follows that a reservation of rent so payable is a material and substantive requirement to be contained in a lease of the property, as essential to the purpose of the grant. The instrument in question contained nothing answering this requirement, and, according to the findings of the master, the contract in fact made contained no provisions of that nature nor looking to that end; nor did it contain any clause giving the grantor the right of re-entry in case of nonpayment of rent. In drawing the decree below, the chancellor undertook to supply these essentials by drawing inferences of fact from the facts found and reported by the master. Therein he says: "It is a fair inference from the facts reported that the price paid was the fair value (of the land) and that the parties contemplated the use of the interest on the money at the lawful rate in liquidation and pay-

ment of the annual rent. No further payment was therefore required. * * * As trustees, defendants could not contract to pay the annual rent with the use of the money, but defendants treated the rent as paid and made no claim for rent from 1852, until they repudiated the lease in 1909. * * * Improvements were made and money expended, and the agreement to pay annual rental at the fixed rate of six dollars may be fairly inferred, its equivalent being provided for and secured. * * * It was clearly the intent of the parties to effect a lease rather than a sale, with annual rent secured in the deposit of money adequate to produce and provide such rent, and secure the fulfillment of the usual terms and conditions of such a lease." How much of the so-called "deposit" stood as security for the payment of annual rent, and how much as security for "the fulfillment of the usual terms and conditions of such a lease," the chancellor did not infer.

An examination of the findings made by the master shows the foregoing inferences which the chancellor undertook to draw, to be inconsistent therewith, and unwarranted, and therefore of no force in the case. The findings of the master show the lot in question to be timber land, except that from twenty to twenty-five acres might be tilled, though no part of the land was ever farmed or cultivated; and it is expressly found in answer to defendants' nineteenth request, that neither Holton and Judevine nor their grantees ever made improvements of any kind on the lot. And there are no facts found from which it can be inferred that any money was expended on the lot, other than what it cost to cut and get off the timber growing thereon, most of which was sold on the stump.

The other parts of the inferences are inconsistent with the findings, showing that the parties contracted for a perpetual lease with commuted rent, that such a lease was given, and that the one hundred dollars was paid to the Grammar School by Holton and Judevine as such rent for all time. That this money was so paid was found in the ejectment case, and that finding, conclusive of the same fact before the master, was equally conclusive before the chancellor, and is conclusive before us. If the money were simply deposited in the manner and for the purposes inferred by the chancellor, it would not be a payment of commuted rent. It would be no payment at all, the ownership of the money would remain in Holton and Judevine, the Grammar School holding it in trust for the purposes of the deposit,

with no right to apply any part thereof (except perhaps the income from it by way of interest) in payment of the rent as it should annually become due. The statement by the chancellor that "the agreement to pay annual rental at a fixed rate of six dollars may be fairly inferred, its equivalent being provided for and secured," it will be noticed, includes a statement of the basis of such inference, namely, "its equivalent being provided for and secured." The fact thus stated as such basis is of record only as it is put into the decree as an inference there drawn by the chancellor, and is one of the inferences here held to be unwarranted.

It is enough to say that in view of the facts found by the master as to the contract made, the belief of the parties as to the right of the Grammar School to make such a contract, the payment of the money as commuted rent under such contract, with the further facts found that Holton and Judevine, and later, Judevine, treated the lot as a holding in fee, being in the possession and occupancy, undisturbed by any claim of right on the part of the Grammar School or others, down to the death of Judevine in February, 1888, and that from the time Holton and Judevine went into possession of the lot under the conveyance from the Grammar School in 1848, down to January, 1909, the latter never collected any rent, made any demand for rent or possession of the land, and eventually forgot they held it in trust, and until 1908 did not know they had a public right in that division of the town of Hardwick, the inference last mentioned as attempted to be drawn by the chancellor is not fairly warranted—the thing inferred is not virtually contained in that from which it is inferred. *Fife* v. *Cate,* cited above.

The decree further states that "the usual covenants of forfeiture for nonpayment or failure to perform may be fairly implied." Implied from what? There is no finding of words used in the instrument of conveyance from which such a covenant can be implied; nor is there any finding of a verbal agreement to that effect, which by mistake was not included in the instrument executed. It is said in *Smith* v. *Blaisdell,* 17 Vt. 199, that "the right to re-enter for nonpayment of rent is not incident to the estate of the lessor at common law, but must be reserved by deed." To the same effect are *Doe d. Dixon* v. *Roe,* 7 C. B. 134, 15 Eng. Rul. Cas. 559; *DeLancey* v. *Ganong,* 9 N. Y. 9.

It is sometimes well to recur to fundamental principles. In

the language of Mr. Justice Washington, in *Hunt* v. *Rousmaniere's Admrs.,* 1 Pet. 1, 7 L. ed. 27, "Equity may compel parties to perform their agreements, when fairly entered into, according to their terms; but it has no power to make agreements for parties, and then compel them to execute the same. The former is a legitimate branch of its jurisdiction, and in its exercise, is highly beneficial to society. The latter is without its authority, and the exercise of it would be not only a usurpation of power, but would be highly mischievous in its consequences." In *Osmond* v. *Anderson,* 2 Ball. & B. 363, where the material ingredient lacking in the terms of the contract was as to what period the advanced rent should commence, the Lord Chancellor said: "The jurisdiction of this court is to compel the specific performance of a contract between the parties, but the contract must be complete; the court cannot supply any term that had not been agreed upon; for that would be to make, and not to execute an agreement, a jurisdiction which this court can never assume." In *Lord Walpole* v. *Lord Orford,* 18 Ves. 402, 420, Lord Chancellor Loughborough said: "But for this court to execute an agreement it is always necessary that the terms should be clear. * * * And I lay it down as a general proposition, to which I know no limitation, that all agreements in order to be executed in this court, must be certain and defined." In *Cooper* v. *Martin* (1867), L. R. 3 Ch. App. Cas. 47, and in *Hallet* v. *Martin* (1883), 24 Ch. D. 624, it is held that equity will not relieve against a defect consisting of an omission or disregard of an essential condition of the power.

It is urged that the defendant has stood by for sixty years and seen Holton and Judevine and their successors take possession of the land in question, treat it as their own, cut lumber upon it year after year, openly, and ultimately sell and convey it, all in good faith and with the understanding, induced by the conduct of the defendant, that they had a lawful right so to do, and consequently defendant is now in equity estopped from asserting that the acts of the plaintiffs were unlawful.. In view of this position by the plaintiffs, it becomes important to notice the inequitable incidents referred to under (b). It will be seen that the record does not bear out this contention. The only finding by the master that Holton and Judevine acted in good faith is that they and the Grammar School believed they had a right to contract for a perpetual lease with commuted rent as they did

contract. The report contains the further finding that Holton and Judevine, and later, Judevine, treated the lot as a holding in fee. There is no finding, and the report does not show, that they or either of them, ever understood that the land was being held by them as lessees under a lease from the Grammar School as lessor, nor that they or either of them so treated it; nor that they treated it as a holding other than in fee simple. And it is found that the executors of Judevine's estate never admitted the existence of the relation of landlord and tenant between the Grammar School and Holton and Judevine, or Judevine, or the grantees of Judevine, until the bringing of this bill.

The plan of leasing power given by the grant to the Grammar School, is for the mutual advantage of the generation existing at the time of the execution of a lease, and of succeeding generations which may properly be termed the future objects of the power. The execution of the power must be such as to give not only a present rent annually for the use contemplated, but such as shall reserve to the future objects in succeeding years, the receipt and full enjoyment yearly of an annual rent by a lease for years (in the legal meaning of that term), reserving to the lessor a reversion, and so conditioned as to bring it within the limitations of the power. No question is here made, nor could there well be on the facts of record, but that Holton and Judevine, when they entered into the contract in question, knew of the public character of the land, and, knowing this, they are to be considered as affected with knowledge of the purpose of the grant to the Grammar School, and of the limitations of the latter's powers in connection therewith. They therefore knew that the objects of the power had a prior and continuing right to the annual use, and that the donee of the power could convey the land only in a manner consistent with its powers, and productive of such use. And yet, they contracted for and took a conveyance which, if operative at all, must operate to the immediate destruction of the power by depriving the donee of the estate to which the power is annexed, and of all control over it, and consequently forever take from the objects, the use to which they were and are entitled. The sale and conveyance of the estate in fee, with the full consideration therefor paid in a gross sum, was not only a fraud on the power, as before observed, but also a fraud on the future objects of the power. The contract for such a sale was unconscionable on the part of the Grammar

School; and it was also unconscionable in Holton and Judevine to obtain such a contract, knowing at the time the nature and purpose of the grant creating the power, and' they made themselves a party to the fraud. *Harnett* v. *Yielding,* 2 Sch. & Lef. 549; 2 Sug. Pow. (3d Am. ed.) 109, 110. Mr. Justice Story says (Vol. 1, Eq. Jur., sec. 173) : ''An act, which violates the very purpose for which the power was created, and the very control over it, which it meant to vest in the donee, is repugnant to it, and cannot be deemed, in any just sense, to be an execution of it.'' And according to the holding of Lord Chancellor Hardwicke in *Le Neve* v. *Le Neve,* 3 Atk. 646, 2 Wh. & Tud. Lead. Cas. (4th Am. ed.) 109, the taking of the legal estate in fee after knowledge of such prior and continuing right, made Holton and Judevine *mala fide* purchasers, even though they may have been purchasers for a valuable consideration in every other respect; which, says his Lordship, ''is a species of fraud, and *dolus malus* itself.''

The position of the executors (as such) of Judevine's estate, is no better than that of their testator in these respects; for they stand in his place, and what was known to him was constructively known. to them as his legal representatives. *Hurlburt* v. *Hurlburt,* 128 N. Y. 420, 28 N. E. 651, 26 Am. St. Rep. 482.

In disposing of the claim of estoppel, we need, in addition to what we have already said, to refer to only one of the general rules governing the doctrine of estoppel, and applicable here: that where the facts are known to both parties, or where both parties have the same means of ascertaining the truth, there is no estoppel. *Boynton* v. *Braley,* 54 Vt. 92; *Sheffield Car Co.* v. *Constantine Hydraulic Co.,* 171 Mich. 423, 137 N. W. 305, Ann. Cas. 1914 B, 984; *Vermont Accident Ins. Co.* v. *Fletcher,* 87 Vt. 394, 89 Atl. 480; *Boynton* v. *Hunt,* 88 Vt. 187, 92 Atl. 153.

But our previous inquiries are not necessarily determinative of the right to an accounting as prayed for by the plaintiffs (under another part of their special prayer), as to the money paid by Holton and Judevine as commuted rent, and interest thereon from the time of payment to the filing of this bill, on the one hand, and a reasonable rent for the land as of the same period, and interest thereon, on the other hand, with a decree for the payment of the balance found due on such accounting to the party entitled thereto, and for general relief. It is to be

noticed that the accounting thus prayed for combines the period prior to Judevine's death, with the period subsequent thereto. But these two periods cannot be combined for such purpose. As will be seen, the accounting for the earlier period rests upon the acts of Holton and Judevine, and Judevine, lawfully in possession of the land, while that of the latter period rests entirely upon acts performed after the latter's death, by his executors and other persons, standing as wrongdoers and having no rights upon the land, whatever.

It was held in the ejectment case that the instrument there held to be void as a conveyance, operated as a mere license (in nature revocable) to enter upon the land attempted to be conveyed; that the license was a personal privilege which terminated. at the time of the death of Judevine, the surviving licensee, in February, 1888. This license gave no interest in the land, and when the licensees were entered thereunder, it justified them in doing only such acts as it authorized to be done. *De Haro* v. *United States,* 5 Wall. 599, 18 L. ed. 681. The true distinction in this respect, as resting on principle, was brought out in the opinion handed down in the action of ejectment, quoting from Lord Chief Justice Vaughan, in *Thomas* v. *Sorrell,* Vaughan, 551, and reaffirmed in the leading case of *Wood* v. *Leadbitter,* 13 M. & W. 838, 16 Eng. Rul. Cas. 49. It would seem from the doctrine there stated that the licensees, Holton and Judevine, had no authority to cut and carry away timber (see, also, *Mooers* v. *Wait,* 3 Wend. [N. Y.] 104, 20 Am. Dec. 667); but we do not decide this particular question, for, in any event, they were holden for the mesne profits, a term sufficiently broad to include all elements entering into their liability.

The general rule in an action for mesne profits is, that the plaintiff may recover the annual value of the land from the time of the accruing of his title; or in other words, he may recover what its use is worth, or the rent therefor. *Lippett* v. *Kelley,* 46 Vt. 516; *Roach* v. *Hefferman,* 65 Vt. 485, 27 Atl. 71. Sometimes the amount of mesne profits may be ascertained by proving the profits actually received. *West* v. *Hughes,* 1 Har. & J. (Md.) 574, 2 Am. Dec. 539; *Worthington* v. *Hiss,* 70 Md. 172, 16 Atl. 534, 17 Atl. 1026. Under our statute, in every action of ejectment if judgment is rendered for the plaintiff, he shall recover his damages, as well as the seisin and possession of the premises. G. L. 2122. This enables the plaintiff to recover not only the

profits that might have been made from the use of the premises recovered, but also such consequential damages as have resulted from the acts of the defendant while in the wrongful occupation of the premises. *Lippett* v. *Kelley,* and *Roach* v. *Hefferman,* cited above. Owing to the peculiar circumstances shown to have existed during the period of the license, it may well be said that in justice the general rule stated above is the only one fairly applicable, should the facts reported form a reasonable basis for an accounting covering that period. As licensees, Holton and Judevine were in the possession and occupancy for some twenty years, and after that, Judevine continued alone during his life-time—in all, forty or forty-one years. In the majority of those years, they, or Judevine, cut more or less timber on the lot, one year cutting from 50,000 to 75,000 feet. The master reports that the amount of cutting done by them, it is impossible to ascertain, except that it was not a stripping of the lot and was not waste in any sense. Thus they proceeded without objection on the part of the Grammar School, and without the latter's paying any attention thereto.

As to the fair annual value of the lot within the period of such possession and occupancy, the master finds that in the year 1852, it was $4.20; but he does not find it for any other year or years, nor does he find that it remained the same during the entire period. True, he proceeds to compute it on that basis, with interest on annual payments of the sum named, until October 15, 1914, in an accounting where, on the other hand, he takes the $100, paid as commuted rent, with annual interest thereon for the same time, finding a balance due the Judevine estate of $413. The master says he makes this finding unless the court is of the opinion that the facts thereinafter found should in equity change it. But this computation and conditional finding is of no consequence in ascertaining the mesne profits exclusively within the period of the license. Moreover, subsequent findings show that the building of the railroad through the town of Hard-wick opened an outlet for lumber within that period. Considering this and the general economic and commercial history of the times from 1852 to 1888, of which judicial notice may be taken, a court may well hesitate in determining the mesne profits for the entire period on the basis of the annual value for the year first named, as not just between the parties. In *McKnight* v. *Taylor,* 1 How. 161, 11 L. ed. 86, the Court, speaking through

Mr. Chief Justice Taney, said: "There must be conscience, good faith, and reasonable diligence, to call into action the powers of the court. In matters of account, where they are not barred by the act of limitations, courts of equity refuse to interfere after a considerable lapse of time, from considerations of public policy, and from the difficulty of doing entire justice when the original transactions have become obscure by time, and the evidence may be lost." Referring to this case of *McKnight* v. *Taylor* the passage here quoted is given with approval in *King* v. *White & Hammond,* 63 Vt. 158, 21 Atl. 535, 25 Am. St. Rep. 752, where the rule is examined at length and applied. The difficulty of doing entire justice in such an accounting within the period named, after this length of time, is obvious from the few material facts relevant thereto which the master was able to report on the evidence adduced before him, and we think from consideration of public policy, it should be refused, other than to let the account on one side offset and balance the account on the other.

The question of an accounting of mesne profits covering the time subsequent to the death of Judevine is more fully presented by the facts reported, and requires careful consideration. The license being personal, and in law revoked by the death of Judevine, the real estate previously held by him under it was not descendible, and at his death formed no part of his estate; and his possession and occupancy thereof in his lifetime were not in law transmitted to the executors of his estate. As such executors, Powers and Peck had no right to enter upon the land in question, they took no rights in or on the lot, nor in or to the timber standing or growing thereon. It should be borne in mind that the lot contained no buildings, that no part of it was ever farmed or cultivated, and that it was only a timber lot in use and in value. If the executors were in fact in the possession and occupancy of the lot after Judevine's death, it must have been because they took possession and went into the occupancy, and not by operation of law consequent upon their appointment as such executors. The master finds that, after Judevine's death, they continued in the undisturbed possession and occupancy, without knowledge of the existence of the right of the Grammar School, until 1894 or 1895, when they sold the stumpage to George T. Howard at the rate of three dollars per thousand feet for spruce, and two dollars per thousand feet for hemlock and

hardwood.  Stevens, Graham, and Kinney, under a contract obtained from Howard, cut 600,000 feet on this lot, of which one-third was hemlock and hardwood, and two-thirds was spruce. This amounted to $1,650, under the stumpage contract of purchase by Howard from Powers and Peck.  The master further finds, however, that the stumpage in that locality was then worth from three to four dollars per thousand feet for hemlock and hardwood, and from four to five dollars per thousand feet for spruce; and that this cut on the lot in question was therefore actually worth (averaging the price), $700 for the hemlock and hardwood, and $1,800 for the spruce; total, $2,500.

Whatever Powers and Peck did by way of possessing and occupying the land, and by way of selling timber standing or growing thereon, they stand in the position of wrongdoers, and equity requires an accounting by them.  The question is as to the extent of the accounting on the facts found.  That they should account for the money actually received for the stumpage, there can be no doubt; for it is inequitable and unjust that they should thus receive and hold money derived from timber standing or growing on property held in trust by the Grammar School for the particular purposes before specified.  1 Story Eq. Jur. sec. 513; *Bishop of Winchester* v. *Knight,* 1 P. Wms. 406; *Caton* v. *Coles,* 1 L. R. Eq. 581; *Monypenny* v. *Bristow,* 2 Russ. & M. 117; *Gardiner* v. *Fell,* 1 Jac. & W. 22; *Hicks* v. *Hastings,* 3 Kay & J. 701; *Hicks* v. *Sallitt,* 3 DeGex, M. & G. 782.

But should they in equity be required to account for the value of the stumpage as found by the master, it being $850 more than the selling price which they received?  Some findings are made as to whether waste was committed by cutting off the timber as it was done while the lot was in the possession and occupancy of the executors.  But such question of waste is not in the case.  Rightful possession of the wrongdoer is essential to the character of waste, and constitutes a material distinction between waste and trespass.  3 Pom. Eq., Jur. sec. 1348.  By cutting off the timber a legal injury was sustained, and the party injured is entitled to just compensation.  He is entitled to be placed in the same situation, so far as an award of damages can do it, as though no wrong had been committed.  The actual injury is none the less because it was committed in good faith, through mistake as to ownership.  He has a right to be made whole again.  To give him less than this, still leaves him an in-

jured party; there is some injury not redressed. By selling the timber, the original wrongdoers derived a benefit from the wrong committed. It seems from the report that the cutting was done in the year 1895 or 1896. We think it clear that the defendant is entitled to recover according to the actual stumpage value of the timber cut, as found by the master, with simple interest thereon from January 1, 1897. *Vandevoort* v. *Gould,* 36 N. Y. 639; *Hodgkins* v. *Price,* 141 Mass. 162, 5 N. E. 502; *New Orleans* v. *Gaines,* 15 Wall. 624, 21 L. ed. 215.

Since, as before observed, the executors of Judevine's estate had no rights in or on the lot in question, nor in or to the timber standing thereon, they conveyed none to George T. Howard under whose contract the timber was cut, and the latter's estate is chargeable with no less measure of damages than are his vendors. *Bolles Wooden Ware Co.* v. *United States,* 106 U. S. 432, 27 L. ed. 230, 1 Sup. Ct. 398. This lot, as a part of the lands forming what the master calls "the whole Judevine tract," was conveyed in fee by the executors to Howard in 1905, and later the latter gave a warranty deed of an undivided third of the same tract to the plaintiff S. Blanche Kent. So far as appears, Mrs. Kent had nothing to do with the lot in controversy, or with the possession thereof, before the taking of this deed. There is no finding that she ever did, or caused to be done, anything on the lot, by way of cutting timber or otherwise, resulting in damage to the land or to the owner thereof. But it was established in the ejectment case that she was in the unlawful possession of the lot. Therefore in that case, in addition to the judgment already rendered for the plaintiff therein to recover the seisin and possession of the demanded premises with costs, nominal damages should be entered, thereby ending the case.

In her application for leave to enter as a party plaintiff in this suit, Ella S. Howard states that she "claims some right in lot 10 in the 18th range of lands in Hardwick," (being the lot here in controversy,) but the record does not show the nature of the right claimed by her, nor does it show how or when she claims to have acquired such right, nor does it show that she ever did anything on said lot, or in connection with the timber thereon or cut therefrom, which renders her liable in the accounting in this action. But on the record before us, she has no right in the lot.

Commissioners having been appointed to receive, examine, and adjust claims and demands of persons against George T.

Howard, deceased, the suit in trespass *quare clausum fregit*, mentioned above, was discontinued as to Howard, and the claim was presented to the commissioners and by them disallowed. An appeal was taken by the Grammar School from such disallowance, which appeal is now pending in county court. This appeal should be disposed of without further prosecution, unless it shall be deemed necessary (concerning which we express no opinion) to take further steps therein looking to the proving of the amount for which said Howard's estate is adjudged chargeable by the decree finally rendered in this suit in equity.

And the said action of trespass should not be further proceeded with as to Powers, since the damages therein sought to be recovered are covered by the accounting here had, and the decree to be rendered.

*Decree reversed and cause remanded with directions that a decree be entered for the payment by the plaintiffs, other than S. Blanche Kent and Ella S. Howard, to the clerk of the court of chancery in and for the county of Caledonia, for the benefit of The Trustees of Caledonia County Grammar School, to be held by it and treated as a portion of the said trust estate, the yearly income whereof to be applied to the use contemplated by the trust, the sum of twenty-five hundred dollars with interest thereon from the first day of January, 1897. From the money so paid, however, The Trustees of Caledonia County Grammar School should, by order of the chancellor, be permitted to pay necessary and reasonable expenses incurred by it in this litigation, (not covered by costs received under the decree,) including fair and reasonable attorney fees as fixed by the chancellor. And further that the plaintiffs be decreed to pay to said clerk for the benefit of The Trustees of Caledonia County Grammar School, the latter's taxable costs in this suit in equity from the time of the filing of the cross bill on September 16, 1913, also the latter's taxable costs and the nominal damages recovered by it in said action of ejectment, also the latter's taxable costs in the said action of trespass quare clausum fregit, also the latter's taxable costs in the said appeal from the disallowance of its claim by the said commissioners, against the said George T. Howard, deceased; and that the said action of trespass quare clausum fregit be no further proceeded with; and that the said appeal be no further prosecuted, unless it shall be deemed necessary to take further*

*steps therein for the purpose of proving, as in the settlement of estates of deceased persons, the amounts for which the said George T. Howard, deceased, (or his estate), is adjudged chargeable in the decree finally rendered in this suit in equity, and which by such decree the estate of said George T. Howard is decreed to pay in the manner and for the benefit of The Trustees of Caledonia County Grammar School as aforesaid.*

MUNSON, C. J., concurs in the result.
HASELTON, J., dissents.