**Ethel C. DEAKYNE, Plaintiff,**

v.

**LEWES ANGLERS, INC., a/k/a Lewes Anglers Association, Defendant.**

Civ. A. No. 2272.

United States District Court
D. Delaware,
at Wilmington.
April 11, 1962.

Clement C. Wood, Wilmington, Del., and Basil C. Clare, Chester, Pa., for plaintiff.

Jackson W. Raysor, Tunnell & Raysor, Georgetown, Del., for defendant.

LEAHY, Senior District Judge.

An action in ejectment[1] was brought by Ethel C. Deakyne, a Pennsylvania resident, against Lewes Anglers, Inc., a Delaware corporation. Plaintiff avers the defendant corporation is in wrongful possession of her land and seeks to recover possession as well as mesne profits in the amount of $24,000. Plaintiff claims that in March 1960 she bought the property from Ernest and Anna Wingate Schoellner, who had purchased it in 1948 from Frederick P. Whitney, Trustee for Bessie Metcalf Wingate. Prior to that date, plaintiff avers the land was owned by the heirs of John Metcalf. Lewes Anglers, Inc., defendant (formerly the Lewes Anglers Association),* does not claim title in its own name, but argues plaintiff's title is defective and if plaintiff should be declared the owner of the property in suit, only nominal damages should be awarded.

The land is situated in the Town of Lewes, in Sussex County, Delaware. It lies on the northeastern side of the Lewes and Rehoboth Canal and on the northern side of Market Street, bounded on the north by lands known as Lot 2 of Thomas Rodney, deceased, and on the east by public lands, and on the south by land of Alice Heskirth.

█ 1. In an action in ejectment, the plaintiff must recover upon the strength of his own title and not upon the weakness of defendant's title. Caton's Lessee v. Hamilton, 1 Del.Cas. 445; Bratten's Lessee v. Wootten, 1 Del.Cas. 172; Pritchard v. Henderson, 3 Pennewill 128, 50 A. 217; Nevin v. Disharoon, 6 Pennewill 278, 66 A. 362; Littleton v. Johnson, 3 Boyce 97, 81 A. 47; Townsend v. Melson, 3 Boyce 78, 80 A. 352; Scotten v. Moore, 5 Boyce 545, 546, 93 A. 373; Ableman v. Short, 5 Boyce 491, 94 A. 900; Wedderburn v. Burbage, 5 W.W.Harr. 229, 162 A. 515. To prevail the plaintiff must either trace title back to the sovereign or original proprietary, or trace it back to an owner in possession of the locus in quo. Caton's Lessee v. Hamilton, supra; Reed v. Short, 5 Terry

[1]. This is the second action in ejectment ever brought in this District. The other was Taylor's Lessee v. Wells, U.S.C.C. Del. (Oct. 1795) Bayard's Notebook, 124, 1 Del.Cas. 384, Boorstin Ed., West Pub. Co.

* The charter of Lewes Anglers Association was repealed on January 17, 1957. Within the statutory period [8 Del.Code, Corporations, § 278] the Association apparently wound up its affairs and transferred all assets to the present defendant, Lewes Anglers, Inc.

103, 57 A.2d 90. In the case at bar, plaintiff claims that on both grounds she is entitled to be declared title-holder of the property.

## I. ESTOPPEL

2. Plaintiff argues that before reaching either of her contentions, the defendant corporation is estopped from denying her title. Two copies of a lease allegedly entered into between defendant, as tenant, and the Metcalfs, predecessors in interest of plaintiff, as landlord, were offered at trial.[1a] Plaintiff contends Delaware has codified the common law principle that a tenant may not deny his landlord's title and accordingly defendant Anglers is thus estopped from denying plaintiff Deakyne's title. 10 Del.Code § 9668 provides:

"(a) The tenant shall not be permitted to dispute his lessor's title, nor shall the estate or merits of the title, except title derived by heirs, or assigns, from the lessor, or claimed as reversioners, remaindermen, or alienees of the title, or estate, which the lessor had at the time of the demise, be inquired into.

"(b) The tenant shall not be permitted to set up a lease made by the lessor to another tenant, nor any other alienation, unless he can show some right, or authority, in himself to continue in possession through, or by means of such lease, or alienation."

Defendant argues the statute merely proscribes defenses which "may not be raised before a Justice of the Peace on a proceeding to evict a holding-over tenant after a notice to quit."[2] The argument is not devoid of merit. The fact that § 9668 falls within the general section titled "Justices of the Peace"[3] need not limit its applicability here, but the subsection titled "Forcible Entry, Detainer and Holding Over," in which § 9668 falls, apparently does limit its applicability.[4] This subsection gives neither command nor hint that it should be applied in the type action[5] tried in this court. But even if the statutory command of § 9668 be limited to cases involving forcible entry, detainer, and holding over, it need not be contested in all other cases. For, even without benefit of statute, Delaware has

1a. "This agreement made * * * between Bessie Metcalf Wingate, Mary M. Moore, Virginia Metcalf Waller and Ethel Metcalf Ruppenthal, parties of the first part, hereinafter called the Lessor and the Lewes Anglers Association * * * hereinafter called the Lessee.

"Witnesseth, the lessor has this date and does by these presents lease unto the lessee the following described property * * *.

"To Have and to Hold the above described premises for a term of ten (10) years from the date hereof at an annual rental of One hundred ($100.00) Dollars, payable in installments of Fifty ($50.00) Dollars, in advance, every six months from the date hereof * * *." PX 4 and 21.

2. Defendant's Proposed Findings, p. 11.

3. 10 Del.Code, §§ 9101–9673.

4. §§ 9651 through 9673 fall within Subchapter V, "Forcible Entry, Detainer and Holding Over." § 9663 relates to "Notice to quit; holding over thereafter; laying of demise." § 9664 relates to "Evidence of demise; presumptions of

tenancy." § 9665 relates to "Termination of estate at will; presumption." § 9666 relates to "Right of remainderman or reversioner to give notice to quit." § 9667 relates to "Transfer of benefits of notice to quit." § 9668, in dispute in this case, relates to "Limitation on defenses." § 9669 relates to "Form of warrant for delivering possession and levying costs; further execution." § 9670 relates to "Judgments." § 9671 relates to "Record of Cause." § 9672 relates to "Reversal of judgment; error; certiorari; restitution."

5. "Legislation has an aim; it seeks to obviate some mischief, to supply an inadequacy, to effect a change of policy, to formulate a plan of government. That aim, that policy is not drawn, like nitrogen, out of the air; it is evinced in the language of the statute, as read in the light of other external manifestations of purpose." Frankfurter, Of Law and Men (1956).

See, generally, Llewellyn, The Common Law Tradition: Deciding Appeals, Appendix C, "Cannons on Statutes," 521 (1961).

adopted the general rule, applicable in suits in ejectment,[6] that a tenant is estopped to deny his landlord's lease.[7] Monbar, Inc. v. Monaghan, 18 Del.Ch. 395, 162 A. 50; Loscolzo v. Eggner, 7 Pennewill 260, 23 Del. 260, 78 A. 607.[8] Defendant's citation of Teagles' Lessee v. Waller, 1 Del.Cas. 132, in an attempt to limit the principle in cases involving leases is unconvincing because the indecisive words in the early (1797) Teagles' case ["it is not perhaps true that defendant by renting the land from the plaintiff accepts the latter's title"] have long since been clarified by the more recent rulings in the Monbar and Loscolzo cases, supra, establishing the general estoppel principle relating to land situate in Delaware.

3. It seems clear that a written lease was entered into between the defendant Anglers and the Metcalf heirs.[9] Although the plaintiff was unable to introduce a signed copy of the lease in evidence,[10] two identical unsigned copies [11] were offered and supported by compelling testimony of witnesses. For example, Howard Teal, president of Anglers at the time the negotiations over the lease took place, testified the copies introduced in evidence were of the lease he had signed representing the Anglers.[12] Mrs. Anna Wingate Schoellner testified she had frequently seen the signed lease in her house, complete as in the copies introduced in evidence.[13] One copy of the lease that was offered had been in the files of Gulf Oil Company since 1937 and testimony of a representative of that company indicated but for the existence of such lease, Gulf would not have made various agreements it did with the Anglers.[14] The other copy introduced in evidence, the same in every detail, was found in the files of Thomas Ingram, at-

6. "In an action of ejectment by the landlord against his tenant * * * at the expiration of his tenancy * * * the tenant cannot, it has frequently been decided, set up defects in the landlord's title as a defense * * *." 1 Tiffany Real Property, § 135, p. 219. See cases, op. cit., n. 37. "It seems that ejectment or like actions * * * when prosecuted by a landlord against his tenant, ordinarily have the character of mere possessory actions in which the tenant is estopped to deny the title of the landlord, and the latter in proving his title, is not required to do more than to establish the relation of landlord and tenant." 89 A.L.R. 1295, "Rule of Estoppel of Tenant, * * *." p. 1296, n. 6.

7. The theory of the rule was stated by Chief Justice Marshall:
"The title of the lessee is, in fact, the title of the lessor; he comes in by virtue of it, holds by virtue of it, and rests upon it, to maintain and justify his possession. He proposes to have no independent right in himself, and it is a part of the very essence of the contract under which he claims, that the paramount ownership of the lessor shall be acknowledged, during the continuance of the lease, and that possession shall be surrendered at its expiration. He cannot be allowed to controvert the title of the lessor without disparaging his own, and he cannot set up the title of another, without violating that contract by which he obtained and holds possession; and breaking that faith which he has pledged, and the obligation of which is still continuing, and in full operation." Blight's Lessee v. Rochester, 7 Wheat. 535, 546, 5 L.Ed. 516.

8. It may be noted that both cases are cited at 10 Del.Code Ann. p. 439, in annotations to § 9668.

9. Defendant admits the existence of an oral lease for ten years with Bessie Wingate. Testimony of Irven Maull, Tr. 219. It denies signing any written lease. Testimony of Maull, Tr. 222; testimony of Larns N. Rodseth, Tr. 268. Under one or the other, rent was paid twice yearly at the rate of $100 a year for the ten year period from 1937–1947. Tr. 221, 222. Check stubs were introduced of 18 such rent payments, PX 41. After the ten year period ended, the Anglers refused to pay any more rent. Tr. 229.

10. Two copies were allegedly signed (Tr. 126), neither of which was located despite testimony of care in searching for them. Tr. 117, 118.

11. PX 4 and 21.

12. Tr. 49, 63, 64–68.

13. Tr. 82, 83.

14. Testimony of Nicholas F. Wolf, field representative of Gulf, Tr. p. 75. Land obtained by the Anglers Association from the Metcalf heirs was in turn sublet to Gulf at rental of $50 a month. PX 20, Tr. p. 70–75.

torney for the Metcalf heirs,[15] after his decease.

[4] The rule of evidence with respect to the admission of copies of documents is that "a person who proposes to testify to the contents of a document, either by copy or otherwise, *must have read it* * * * [The witness] must speak from personal observation of the event or thing to be testified to * * *." 4 Wigmore, Evidence, (3rd Ed.) § 1278. These conditions having been met by the testimony of plaintiff's witnesses, I conclude PX 4 and 21 offered as copies of the lease were true copies of a written lease, entered into between defendant Anglers and the Metcalf heirs.

■■ 4. The mere existence of the lease need not of itself decide the issue at bar. Ritualistic repetition of principles of landlord-tenant law is no substitute for factual analysis to determine if parties actually intended to become landlord and tenant.[16] The word "lease", like all others, may mean different things depending upon its context.[17] But the present case offers no escape for defendant because of failure of proof of a complete and formally signed copy of the lease by both landlord and tenant. Absence of the legal symbol of such a lease is supplied by the language-fact relationship which appears from the testimony of witnesses and what the parties did with respect to the *locus in quo*.[18]

■ Paragraph one of PX 4 and PX 21 states that the agreement is between the Metcalf heirs, "hereinafter called the lessor" and the Lewes Anglers Association, "hereinafter called the lessee." Para-

graphs two and three describe the property involved in the lease. "Witnesseth, the lessor has this date and does by these presents lease unto the lessee * * *." Paragraph four states the rent to be paid. Paragraph five states that the lessee may change the topography of the land in various ways and limits the use of the property to purposes "essential to the fishing party industry." Paragraph six grants to the lessee a first option on purchase of the land during the term of the lease. Paragraph seven states provisions with respect to the removal of buildings, docks, etc. from the land. Paragraph eight states penalties for failure to pay "any installment of the rental as agreed" or failure to perform any other condition stated in the lease.

In short, the lease discloses no intent of the parties to become anything other than landlord and tenant and have any other legal rules applied to them than is ordinarily applied in such cases of tenancy.

■ 5. Defendant argues, however, the land boundaries were unclear to all parties at the time the lease was signed, that "the defendants could not by such an agreement confirm the title of the Metcalf heirs in a tract of land whose dimensions and location were unknown, even to the heirs, and [that] defendant was, in fact, 'buying peace' for a very nominal amount."[19] This argument lacks validity. A party may confirm title *so far as he is concerned* to any piece of land he rents by lease so long as the boundaries of the land are not so vaguely stated as to be impossible of determina-

---

15. Tr. p. 124.

16. It has thus been held that the mere payment of rent by one in possession will not preclude him from showing the true character under which he holds the premises. Russell v. Banks, 11 Cal.App. 450, 105 P. 261.

17. Justice Holmes wrote that "a word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." Towne v.

Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 62 L.Ed. 372.

18. What parties do under any writing between them is an important aid in arriving at the paramount question of intent. See Attorney-General v. Drummond, 1 Drury and Warren, 353, 368, where Lord Chancellor Sugden said: "Tell me what you have done under such a deed and I will tell you what the deed means."

19. Defendant's Proposed Findings, p. 12.

tion. The landlord may not actually have stainless title. Another party may challenge the landlord's title in a later suit, *but the tenant is personally bound by his voluntary act of helping to create the tenancy.*[20]

True, a party may have any number of reasons for becoming a tenant. He may wish by doing so to "buy peace". Should that be his purpose, he is free to use the lease form to do so. Yet, once the form is adopted, barring countervailing considerations, he must accept all ordinary legal consequences of his act. One such consequence is his bar from denying his landlord's title.

No other general exception to the application of the estoppel rule has been claimed here by defendant. No other exception has been found by the Court that would bring the fact situation presented here outside the gambit of the rule. The defendant is thus estopped from denying title of the plaintiff.

## II. THE TITLE

6. The same legal conclusion is reached on other and independent grounds if the attempt of plaintiff to trace title back to the sovereign is considered.[21] On April 10, 1795, the State of Delaware granted to Joshua Hall a patent for a tract of land in Sussex County.[22] The patent and the Certificate of Survey therein mentioned are stated to be based upon a proprietary warrant issued to one Anderson Parker on April 17, 1761 and assigned by Parker to Hall on January 9, 1792.

No record has been found of the proprietary warrant having been executed prior to the American Revolution [23] and it is thus necessary to examine briefly the effect of Delaware's joining the Un-

20. Lord Coke wrote that estoppel was so named "because a man's own act or acceptance stoppeth or closeth up his mouth to alleage or plead the truth." 3 Coke on Littleton, 342.

In the present case, defendant's "acceptance" came about when it acknowledged plaintiff's title by signing a lease for the property in question and assuming the role of tenant.

21. The Court is indebted to Judge Lawrence Elliott's Abstract of Record Title (PX 61) from which much of the information in the following section of this opinion was culled. His diligent and scholarly research on titles to land situate in Sussex County, Delaware, has long since earned him the respect and admiration of the bench and bar of Delaware.

22. "A certain tract of land situate in Sussex County, containing Eleven Acres and One Hundred and thirteen square perches butted and bounded as followeth, to wit, Beginning at the South point of a small Island just above the Bridge across Lewes Creek, thence running North Eighty One degrees West ten perches to the North foot of the Bridge; thence North Forty One degrees West Seven perches, thence North Twenty degrees West twenty three perches to the West side of the Island of Marsh on the West side of the Bridge; Thence along the Old Channel North Sixty degrees East Fifty Six perches to the Cape side; Thence South Fifty three degrees East Twenty four perches; Thence South Fifty two degrees West Sixty one perches home to the place of beginning, containing Eleven Acres & one hundred and thirteen square perches of Marsh. (Surveyed the Seventeenth day of January One thousand seven hundred & Ninety two by Joseph Copes for Rhoads Shankland, surveyor of Sussex County, In pursuance of a proprietary Warrant dated at Philadelphia the Seventeenth day of April one thousand Seven hundred and Sixty one Granted to a certain Anderson Parker for twenty acres of land who sold and assigned the same to this Patentee, who was adjudged by the Commissioners of Property to hold the same, reserving to the public the use of the Land whereon the Bridge and Causeway is erected and Mud sufficient to Repair the same, which said Island of Marsh is called and known by the Name of 'Hall's Purchase' as per Certificate of Survey enrolled in the Rolls Office for the County afs'd., may appear), with the appurtenances.

"To Have and To Hold the said Tract of Land with the appurtenances, to him the said Joshua Hall his heirs and assigns forever, as his and their absolute and unconditional estate and property, free and clear of all reservation of Rents or Services whatsoever Except as before Excepted." Patents Book T, No. 19, page 71.

23. PX 61. p. 2.

ion on such warrant. Delaware joined in the Declaration of Independence on July 4, 1776 and on September 11 of that year adopted the "Declaration of Rights and Fundamental Rules of the Delaware State." A first Constitution was adopted on September 20, 1776 and a second on June 12, 1792, which remained in effect until 1831.[24]

Article 24 of the Constitution of September 20, 1776, provided in substance that all Acts of the Assembly in force on May 15, 1776 should continue in force until altered or repealed by the Legislature. However, the status of certain warrants, surveys and titles to land were left uncertain and apparently no provision was made for obtaining grants or patents on vacant lands.[25] Beginning February 2, 1793, three statutes were passed to remedy the situation. They were: An Act Concerning Vacant and Uncultivated Lands, February 2, 1793;[26] An Act for Opening and Establishing a Land Office within This State and for the Sale of all Vacant and Uncultivated Lands therein, June 19, 1793;[27] and A Supplement to the Act for Opening and Establishing a Land Office, etc., February 7, 1794.[28]

The Act of February 2, 1793 prohibited the taking or receiving of any warrant or making any survey thereunder or taking any grant or deed from any person not acting under the authority of the State of Delaware for any vacant or uncultivated lands. It further provided that warrants issued after July 4, 1776 should neither be laid nor surveyed, nor any patent granted, nor deed received on any warrant or survey issued or made

since July 4, 1776. Apparently warrants issued prior to July 4, 1776 could still be lawfully located and surveyed.

Section 8 of the Act of June 19, 1793 provided that nothing in the act should impeach, impair or in any manner call into question title to any lands held under any grant, warrant, survey, re-survey or patent made or issued prior to 1776.[29]

Where unexecuted warrants had been issued after January 1, 1776, section 5 of the Act of June 19, 1793 provided that the person to whom the warrant had been granted might apply to the Board of Commissioners set up by the Act and obtain a certificate to be returned to and filed of record with the County Recorder. Disputes concerning the location of any survey were to be determined by the Board of Commissioners upon caveat filed by any contestant before them.[30] Appeal was permitted from any decision of the Board to the Supreme Court of the State.[31]

The Act of February 7, 1794 provided that any person legally claiming under any warrants issued on or after January 1, 1760 and before January 1, 1792, which had not been executed, might apply to the Board of Commissioners of the County for a certificate specifying the quantity of land permitted to be held under such warrant. After any caveat was determined under the Act, the Board was to give a certificate to the person claiming under the proprietary warrant upon which he would be entitled to obtain a patent.

On May 1, 1794, Henry Neill filed a caveat[32] before the Commissioners of

24. 1 Del.Code, Early Constitutions, pp. 81, 85, 93.

25. PX 61, p. 2.

26. 2 Del.Laws Ch. 10, p. 1077.

27. 2 Del.Laws, Ch. 45, p. 1160.

28. 2 Del.Laws, Ch. 57, p. 1174.

29. Section 10 of the Act provided that nothing in the Act of February 2, 1793 should be construed to vacate or annul any warrant issued between January 1, 1776 and January 1, 1792, nor any pat-

ent, deed, grant, or survey made or obtained thereon between those dates. Section 11 provided that title to any lands held under any grant, warrant, survey, re-survey or patent made or issued between January 1, 1776 and January 1, 1792 should be good and available in law and equity.

30. Sections 1, 2, 3.

31. Section 6.

32. Henry Neill v. Joshua Hall, #223 Caveat Docket, p. 112.

Property of Sussex County against Joshua Hall's Certificate of Survey, which located his land on an island in Lewes Creek. On January 8, 1795 trial was had, after which a decision was rendered in favor of Hall, as follows:

"Jan.y 8th 1795 the parties to the within Caveat laid down before the Commissioners their pretensions of Claim and the Commissioners do order that the Defendant should have a Certificate upon a Survey made by the said defendant upon a piece of Marsh in Lewes Creek through which the Lewes Bridge doth pass always reserving to the public the use of the Causeway through the same and mud sufficient to repair the same, In pursuance of a Warrant granted to Anderson Parker on the 17th of April 1761 and by him regularly assigned to the said Joshua Hall on the 9th day of January 1792."

Following the caveat proceedings, on February 18, 1795, the Board of Commissioners approved Hall's patent and stated:

"We * * * do certify that Joshua Hall within named to whom it appears to us the within described Warrant have been legally transferred may be permitted to hold the within quantity of Eleven Acres & one hundred & thirteen perches of land *reserving* to the publick the

use of the land whereon the bridge is built and mud sufficient to Repair the same * * *." [33]

On the basis of these facts, plaintiff argues that all questions as to the "existence and validity of the warrant, the validity of the assignment thereof, the location of the survey and the status of the land as vacant land subject to private grant, have been rendered res adjudicata." [34]

Defendant argues that the original warrant issued to Anderson Parker in 1761, which remained unproved as of the passage of the Public Lands Act of 1793, was "vacated and rendered null and void" [35] by operation of 2 Delaware Laws, Chapter 59, § 12.[36] Defendant further argues that the caveat proceedings between Neill and Hall could neither "pump life" into the allegedly invalidated 1761 warrant, nor be construed as res adjudicata against himself, "neither a party thereto" nor one who "claims through any person who was a party." [37] Yet Section 12 of the Public Lands Act apparently applies not to the land in question here, but only to the land and marshes along the Southwest side of the creek between Front Street and Lewes Creek. Expert testimony has been adduced to the effect that all the land in question was an island of marsh lying in the Lewes Creek between two channels, the Cape Channel and the Town Channel, and that it was not a part of Cape Henlo-

33. Certificates Book S, No. 18, Page 274.

34. PX 61, p. 5.

35. Defendant's Proposed Findings of Fact and Conclusions of Law, p. 8.

36. "BE IT FURTHER ENACTED, That all the streets of the town of Lewes, and the bank and marshes between Front-Street and Lewes Creek, and between South-Street and Canary Creek, which have heretofore been considered as common and public property, shall not be subject to be taken up by any warrant to be issued in pursuance of this act, or the act to which this is a supplement, but shall from and after the passing of this act, be vested in the inhabitants of the Town of Lewes, and the citizens of

this State in general, for their common use and benefit; and all warrants already issued to take up any part of the said streets, bank, or marshes, are hereby vacated and made void; and the said streets shall be and remain open as common highways, under such regulations as other highways in this state; and if any person shall in any manner obstruct the said streets, or highways, he shall forfeit and pay the same sum as by law he would forfeit and pay for obstructing any other highway within this state, to be recovered in the same manner that such forfeitures, by the laws of this state, are directed to be recovered."

37. Defendant's Proposed Findings of Fact and Conclusions of Law, p. 9.

pen, [38, 39] and thus subject to the restrictive provisions of Section 12.

■ Moreover, other considerations lead this Court to conclude that the patent granted by the State to Hall well over a century and a half ago should not now be declared invalid. Whether or not the caveat proceedings need be considered res adjudicata against this defendant, this Court has no hesitation at looking to the decision of the caveat proceeding for guidance in interpretation of laws in effect at that time as they affected the property in question. For in cases in which the invalidity of a patent is claimed,

> " * * * the presumptions that all the preceding steps required by the law had been observed before its issue, the immense importance and necessity of the stability of titles dependent upon these official instruments, demand that the effort to set them aside, to annul them, or to correct mistakes in them should only be successful when the allegations on which this is attempted are clearly stated and fully sustained by proof." [40]

In the present case, no such burden has been met by the defense.

7. Joshua Hall and his wife conveyed the lands in question by deed to William Coleman on December 24, 1800.[41] Coleman died intestate and upon amicable partition the land passed to Thomas Coleman.[42] On June 20, 1842 the property was conveyed to Richard Burton.[43] Burton died on June 15, 1849 and his executor sold the land to John Metcalf on December 1, 1864.[44] By partition proceedings the lands of Metcalf were divided.[45]

8. Plaintiff argues that on March 6, 1848 Frederick P. Whitney, trustee for the Metcalf interests, properly conveyed the land in question to Ernest Schoellner at partition.[46] Defendant, however, argues that Metcalf had been seized with three parcels of land on the Northeast side of Lewes Creek only one of which [47] he had conveyed away before his death. The two tracts still owned by Metcalf at his death,[48] it is alleged, were separated by a full city block and never touched. Thus the trustee's sale at partition of "all that tract, piece, or parcel of marsh land" owned by Metcalf northeast of Lewes Creek was unclear as to which of the two parcels were sold or whether both were sold. This Court, defendant concludes, "may not speculate" as to the intent of the purchaser of the lands or of the trustee. "Plaintiff has the burden of proving her record title and any deficiency in that proof may not be supplied by surmise or conjecture." [49]

■ Titles are not to be defeated so easily. The relevant portion of the petition presented by Bessie Metcalf Wingate to the Orphans' Court [50] states that the partition includes:

> "Tract No. 3. All that certain tract, piece and parcel of marsh land

---

38. Testimony of Lawrence Elliott, Tr. p. 293; PX 61, p. 7.

39. For discussion of title to the land identified as Cape Henlopen, see United States v. 1,010.8 Acres, D.C.Del., 56 F. Supp. 120.

40. Maxwell Land-Grant Case United States v. Maxwell Land-Grant Co., 121 U.S. 325, at 381, 7 S.Ct. 1015, at 1029, 30 L.Ed. 949.
   "The issuance of a patent * * * raises the presumption that it was validly issued, and one seeking to set it aside must sustain his averments in that regard by clear proof." 3 Tiffany, Real Property (3rd Ed.), § 949.

41. Tr. pp. 294–295.

42. Tr. pp. 296–297.

43. Tr. p. 299.

44. Tr. p. 301.

45. Tr. pp. 149–153.

46. Plaintiff's Proposed Findings, p. 12.

47. Parcel #3, PX 9.

48. Parcels #1 and #4, PX 9.

49. Defendant's Proposed Findings, p. 10.

50. PX 58.

with canal frontage, lying on the Eastern bank of the Lewes and Rehobeth Canal, in the Town of Lewes, County of Sussex, State of Delaware, located on the easterly side of said canal, containing in all about 10 acres more or less, except such of said lands as were released to the United States Government for canal purposes."

A series of facts and inference-facts may be drawn from the petition:

1) Since the total land area of both parcels was between ten and eleven acres, the petition probably was intended to refer to both parcels.[51]

2) Since Whitney as trustee would have served little purpose, except fomenting judicial confusion, by selling only one parcel of the possible two, Whitney probably intended the petition to dispose of both parcels (which he may have considered as one).[52]

3) Since all lands released to the United States for canal purposes fell within the land in suit [53] *at least* that parcel containing the land in suit may be said to have passed at the partition sale. I hold that Parcel #1, including the land in suit, did so pass.

51. Tr. p. 305.

52. Tr. pp. 306, 307, 313, 314.

53. Each deed conveys: "All that certain use of so much of above mentioned land bordering on and adjacent to said canal as shall be necessary and required by the said party of the second part: (a) Constructing an inlet near Lewes, Delaware, leading to the Delaware Bay; (b) Excavating a channel six (6) feet deep at mean low water and one hundred (100) feet wide from the Broadkill River near the mouth to the highway bridge at Lewes, Delaware; (c) use as a place of deposit for material removed from the above inlet and the above-mentioned channel." PX 56A, B, C, D.

54. Tr. pp. 152, 153; PX 61, p. 62.

55. Testimony of Harry M. Grieves, Tr. p. 132.

56. See, Siefken v. Sommers, 1 N.J.Misc. 559, holding that where plaintiff in eject-

9. Ernest Schoellner and Anna Wingate Schoellner conveyed the land to the plaintiff by deed on March 22, 1960.[54]

10. Plaintiff has thus successfully traced title back to the sovereign.

### III. MESNE PROFITS

11. After a recovery in ejectment, a plaintiff may recover mesne profits for the three year period preceding the commencement of the action. 10 Del.Code, § 8109. In the present case, expert testimony has been adduced that the fair rental value of the property for the three year period was $10,000.[55] Defendants have offered no evidence as to rental value.[56]

■■■ 12. Defendant argues that as plaintiff Deakyne only obtained her rights to the property in question in March 1960, her right to recover profits should be limited to the period after that date.[57] But plaintiff purchased all rights that Ernest Schoellner had to the property,[58] one of which was to bring action for such rents as were owed.[59] "A plaintiff in ejectment may recover damages or mesne profits for lands unlawfully detained by defendant prior to his acquiring title, if the right of action therefor is transferred to him by his grantor." Lord v. Dearing, 24 Minn. 110.

ment action produced substantial testimony as to value of property and defendants produced none, nominal damages awarded to plaintiff were insufficient. All testimony by defendant as to value was by Irven Maull, discussed infra.

57. Some cases do give support to a suggested rule that a plaintiff may only recover mesne profits from the time of his taking title. Powers v. Trustees of Caledonia County Grammar School, 93 Vt. 220, 106 A. 836; Sanderson v. Price, 21 N.J.L. 637. But neither of the above cases cited by counsel nor any others uncovered by the Court so hold where the plaintiff *was* a purchaser of the property.

58. PX 59.

59. The deed provides, *inter alia*, that Mrs. Deakyne is granted "the tenements, hereditaments, and appurtenances thereunto belonging, or in any wise appertaining, and the reversions, remainders, rents, issues, and profits thereof." PX 59.

13. In an action at ejectment the value of improvements made upon the premises by defendant may be recouped or recovered by him analogously to a set-off against the demand of plaintiff. 2 Woolley, Delaware Practice § 1618; Scott v. Alexander, 2 Houst. 321, 7 Del. 321. Here defendants made improvements to the property of such value that Harry M. Grieves, testifying for plaintiffs as to value of the property, initially declared that if the boat slips built by defendants were not present, the property would be "valueless".[60] Defendant claims [61] that where such improvements are made by defendants, plaintiff must either place a fair rental valuation on the property without the improvements or fail in its efforts to prove damages.[62] But this confuses plaintiff's obligation to prove damages with defendant's obligation to bring to the Court's attention matters that might result in their mitigation or reduction.[63] Recoupment is not a right of defendant to be assumed until disproved by plaintiff.[64] Evidence submitted by defendant as to improvements placed upon the land is limited to uncontradicted statements of Irven S. Maull, treasurer of the original Anglers' Association,[65] and presently treasurer of Lewes Anglers, Inc.[66] Mr. Maull testified the Anglers had borrowed $4200 from the Lewes Trust Company in 1937 [67] (repaid a total of $4500 to the bank, including interest) and spent it on improvements of the property.[68] $600 was given to the Anglers by the Town Commissioners; $300 by the Chamber of Commerce; $150 by merchants in Lewes; and a total of from $210 to $240 was contributed by members on dues at the founding of the Anglers. The above was, according to Maull, used to finance improvements.[69] He further testified that in the last year $1900 had been spent for dredging the boat slips and repairing docks.[70] Other testimony of Mr. Maull as to amounts spent on improvements fails of sufficient clarity to enable the Court to determine what further amounts may have been spent.

14. Accepting the $10,000 figure suggested by Mr. Grieves to be the fair rental value of the property, and subtracting: (a) $4500 repaid to the Lewes Trust Company by 1942 for the loan spent on improvements; [71] (b) $1260

---

60. Tr. p. 136. Grieves subsequently stated that the land could be used for storage. Tr. p. 136, that "it would not be valueless if they found a purpose for it," Tr. p. 139, and finally that "I would not say that it is valueless, because all property anywhere in the world has value regardless of where you go," Tr. p. 140, but he was unable to estimate value of the property without the boat slips, Tr. p. 140.

61. Citing Wilson v. Lank, 12 Del.Ch. 413, 107 A. 772, which held in a partition proceeding (and without reference to problems of burden of proof) that, where one tenant in common has improved premises, the cost to him of the improvements need not determine his rights to compensation, but that the applicable yardstick of measurement should be such enhancement in value of the premises as resulted from the improvements.

62. Defendant's Proposed Findings, p. 14.

63. See, 1 Sutherland, Damages, (4th Ed.) § 188.

64. "Recoupment is not a right, but a remedy in the nature of a cross action

* * * that may be applied by the defendant in an action in certain cases to wholly offset or reduce the plaintiff's demand. Its application is based on principles of justice where it would be contrary to equity and good conscience to permit a full recovery by the plaintiff, where the defendant has claims growing out of the same transaction, which while they could be litigated in another action could also be properly and conveniently litigated in the same action, thereby preventing the necessity of two suits." Mackenzie Oil Co. v. Omar Gas and Oil Co., 4 W.W.Harr. 435, 34 Del. 435, at 454, 154 A. 883, at 891.

65. Tr. p. 206.

66. Tr. p. 208.

67. Tr. p. 226.

68. Tr. p. 227.

69. Tr. p. 225.

70. Tr. pp. 260, 261.

71. Plaintiff's argument against allowing *any* set-off for improvements made, due to defendant's allegedly "dirty hands" is rejected. While defendant's hands are

contributed by miscellaneous sources at the inception of the Anglers, spent on improvements; (c) $1900 spent in the last year for improvements, the figure of $2360 remains. An additional matter must be considered. Defendant apparently claims that as seven docks, renting for $80 apiece, were not rented last year,[72] the figure of $560 should be deducted from fair rental value. While it would not be wholly equitable to penalize plaintiff-title-holder for failure of defendant to rent the seven docks, under all the equities of the case it is concluded that upon the analogous doctrine of divided damages, the figure should be halved and $280 deducted from the total figure. Even the remaining amount cannot be left without further consideration. For "fair rental value" need not be the same as a fair statement of mesne profits. Evidence presented to this Court on the issue of damages by both sides has been so scanty and inconclusive that the Court is forced, on the basis of an examination of the record as a whole, to decide whether the figure of $2080 is either insufficient or excessive. Taking into account the small amounts of rent paid on this property in the past (totalling $100 per year by the Anglers) and the small bank account remaining at the end of the last three years of operation of the Anglers,[73] the Court reduces the figure of $2080 by $1000 (the total amount paid by the Anglers as rent for a ten year period) and orders:

1) The Anglers to restore to plaintiff the possession of the property herein discussed.

2) The Anglers to pay mesne profits in the sum of $1080.

An order in accordance with the foregoing may be submitted.**

not without blemishes the tangled and confused tale of the land here involved may be said to allow the defendant an extra degree of equitable tolerance.

72. Tr. p. 239.

73. At the end of 1957, the Anglers had $1484.86 in the bank; at the end of 1958, $2399.11; 1959, $2629.25; 1960, $5732.-

** The opinion herein incorporates the findings and conclusions required under Federal Rules of Civil Procedure, rule 52, 28 U.S.C.